# EXHIBIT B

Q And what makes you sure you've seen that policy?
A Because I'm sure -- I've read this several times and I know -- I know this is in here and I know that we don't discriminate against people that have disabilities.
Q Okay. Now, first you said you've read it several times, and when you say "this," are you referring to the driver manual?
A Uh-huh, yes.
Q Okay. And when you say, you know, that "we don't discriminate based on disabilities," what do you mean by that?
A I know what ADA stands for and we -- I -- we go by -- all I'm -- I'm not -- all I'm doing is collecting information to get it to -- if there's a question that does not meet what DOT says, then I will refer it to Dr. Cooper. If there's any questions that I am not sure of, I take it to human resources, which is Allen Roller, that is very well versed on ADA, Tony. There were times that, when Kenneth Hixson was above me, you know, I would give it to him and they would say -- direct me to collect information to, you know, provide it to Dr. Cooper.
Q Okay. And you understand, Ms. Brown, that



the Commission, the EEOC, has not sued you personally, you understand that?
A Oh, I do understand that. Yes, I do understand that.
Q You said that P.A.M. doesn't discriminate based on disabilities. Let me ask you this, do you know what the ADA says regarding disability related inquiries?
MR. DAMM: I'm going to object to the form of the question. As a lay person, you're asking her what the law is and says. If she has any idea of answering your question, she can try to answer it.
THE WITNESS: And can you repeat that again? I'm sorry.
MS. CAMPBELL: Can you read that back?
(Record read as requested.)
THE WITNESS: We're asking -- all I'm doing is collecting information from a physical. If a physical does not meet the compliance, we ask for additional information to forward to our company doctor.
Q (BY MS. CAMPBELL) Okay. And you've -- you collect information regarding the driver's medical condition; correct?



A If it's not in compliance with DOT.
Q Okay. I want to ask you to turn to that next page, which is page 27, and if you'll go down through half the page, and it says "Medical clearance."
MR. DAMM: Excuse me. On page 27?
THE WITNESS: This one right here.
MR. DAMM: I understand. She said page 27, did you not -- yours has got --
MS. CAMPBELL: It's Bates Number 28.
MR. DAMM: Okay. I just want to make sure that we're on the right page.
Q (BY MS. CAMPBELL) Do you see the paragraph where it says, "Medical clearance"?
A Yes, ma'am.
Q Okay. Can you please review that paragraph and then, when you're done, look up.
A (Witness complies.)
Q Are you familiar with this policy?
A Yes, I am.
Q How are you familiar with the policy?
A Because this is the department I work in, that, again, our company policy is if a driver employed by us seeks medical attention, they have to clear us, that -- and it's on a compliance, it is on



a compliance per DOT. DOT states that, I think it's 390.3D, something like that, that we can be as stringent as we want and we can ask for additional information.
Q Do you know who created the policy that we've marked as Exhibit 1?
A This policy was before I started work here.
Q Has it changed since you started working for P.A.M.?
A There has been adjustments, yes.
Q Who's made those adjustments?
A Corporate heads, counsel.
Q Which corporate heads?
A I think Tony Longinotti has been involved.
Q Anyone else?
A I wouldn't know, I don't go to -- I'm not in those meetings.
Q Okay. Do you know -- you said there have been changes, do you know when the first change occurred?
A I do not know.
Q Do you know when the last change to the policy occurred?
A I think it was a few years ago when the

last change had been made.
Q Do you recall what the changes to the policy have been?
A If I recall, it was where we were trying to initiate getting a driver cleared as quickly as possible so we -- what we were doing is, like for a dental, unless a narcotic was given, we were trying to get them right back on the road where we weren't trying to hold them down, you know, for -- until we got the paperwork. If no narcotics were given, we try to get a person cleared faster.
Q Okay. Now, was that how you all were applying the policy that changed, or was it the actual language in the policy that changed?
A We were trying to -- they tried -- there was a language, I think there was -- and I'm -- there was a language where they were trying to -- they had to report when they're going to a medical professional. And on dental we were saying that if you're just going to the dentist with no medication, you can be cleared, and then -- prior to clearing the medical department.
Q Okay. For the record, I want to refer you back to the policy where it starts with, "Per company policy," and can you please read that



paragraph?
MR. DAMM: You want her to read the entire -- the document doesn't speak for itself? Is that -- you're asking her to read that entire paragraph?
Q (BY MS. CAMPBELL) Do you see where it says, "Per company policy"?
A I do.
Q Can you please read that paragraph for the record?
A "Per company polly," I'm sorry, "policy, illness or injury needs to be reported to the medical compliance department. If a driver seeks medical treatment through a licensed health care facility or medical provider, he or she will need to be cleared through the medical compliance department prior to getting back on the truck. This protocol has been established to assure the safety of our drivers, the welfare of the public in general, in compliance with DOT guidelines and internal criteria of the medical compliance department.
"Prescription drugs must be reported to the medical compliance department before being allowed on the truck to ensure DOT compliance."
Q Thank you, Ms. Brown.



Now, as you're sitting here today, do you know if there have been any changes to the language that you just read since 2005?
A Not in that particular contents, no, there's not been a change, we -- it remains the same.
Q Okay. So since January 2005, up until the present time, that language that you just read remains the same?
A That is correct.
Q Okay. Do you have the authority to change the language that you just read?
A Absolutely not.
Q And you say that, you know, with conviction; why do you say that?
A Tony's my boss.
Q So you don't make changes to the policy?
A Uh-uh, uh-uh, no, I do not.
Q So it's safe to say that your responsibility is just to enforce this policy?
A That is correct.
Q And it refers to the medical compliance department, and that's the medical compliance department that you're over; correct?
A That is correct.



Q So it's my understanding that, under this policy, any illness needs to be reported to the medical compliance department; is that correct?
A That is correct, and that is DOT.
Q When you say "that is DOT," what do you mean?
A If you look in the DOT book it will tell you illness or fatigued drivers, and I think it's 391-point -- 392.3, if I'm not mistaken, illness or fatigued drivers.
Q Okay. And what does it say about illness or a fatigued drivers?
A I can't give you verbatim, but it basically tells you that, you know, they're not to drive.
Q So it's your understanding that the DOT regulations does not allow a driver who's ill to drive?
A That is in the motor carrier book.
Q And it's also your understanding that DOT regulations does not allow an injured driver to drive?
A I'm not work comp.
Q Is there anywhere in the DOT regulations that says that a driver has to report to his or her

employer that he has an illness?
A 391.41 does indicate only physically qualified drivers, and in the DOT it also says that it is ultimately the responsibility of the carrier to have a safe driver.
Q Okay. And my question was, you know, does the DOT regulation require a driver to report to his or her employer any time he or she is ill?
A In the motor carriers there is.
Q Ms. Brown, that's a "yes" or "no" -- not to interrupt you, but it's a "yes" or "no" question.
A Well, I'm unsure because I do think it's a yes, but I think possibly a no, but I want to say both.
Q Okay. Go ahead and explain for me.
A Okay. Well, illness or injury, it says that they cannot drive fatigued or illness, and I can't remember verbatim what it has, but by recall, I think there is reference to a motor carrier will not allow them to drive, which would be they have to report it to us, because we have to clear them to drive.
Q So it's your understanding that the DOT regulations requires a driver to report to his or her employer any time he or she is ill or injured;



is that correct?
A Under that criteria, I would say yes, and along with our company -- and it's our company policy, driver manuals, yes.
Q So under DOT regulation and driver manuals, any time a driver is ill --
A Company policy, yes.
Q So let me just understand this, because -- and I'm -- you know, you're the expert on P.A.M.'s policies, I'm not, so I'm just trying to understand the policy. Under the P.A.M. policy, any time a driver is ill, he or she must report it to your department; is that correct?
A That is correct.
Q And under the P.A.M. policy, any time a driver is injured, he or she must report it to the company?
A That is correct.
Q Okay. And the next sentence refers to medical treatment. If you'll refer to the next sentence, is it also true that, under company policy, any time a driver seeks any type of medical treatment, he or she must report it to the company -- to your department?
A That is correct.



Q Okay. So that would include a woman going for a pap smear?
A They would say annual.
Q Okay.
A They're going for their annual.
Q So it would include a woman going for an annual physical?
A Uh-huh.
Q And a man going for an annual physical?
A Correct. And we try to encourage them to use it as a wellness.
Q When you say that, what do you mean by that, when you say "use it as a wellness"?
A It's a benefit to them, it's a benefit that P.A.M. gives, and we try to encourage people to, you know, to have annual physicals. I mean, it's a benefit, it's a free service that P.A.M. takes pride in.
Q What if a driver is going to get a back adjustment from some kind of chiropractor, do they have --
A We -- yes, ma'am.
Q And we've already discussed, I believe, dentist visits, those have to be reported?
A Yes.



Q Are there any types of contact with medical professionals that you know of that a driver would not have to report to your department?
A If they're just getting their -- say, their glasses, they have current glasses that comply with meeting the standards to drive and they're just replacing them, or contacts, they -- no.
Q So what would alert a driver to the fact that he or she does not need to report a visit to get contact lenses?
A It is told to the drivers, in general, if they're not sure if something needs to be reported, to call directly into the medical department, and if they tell us what's going on or what they're doing, we will tell them whether it is necessary or not, because too many times, say, they might tell their manager and they get it incorrect, and we explain to them, "If you want accurate information," and we do explain to them they do not have to relinquish any medical information to anybody that does not work within the confines of the medical department.
Q Okay. So you inform the drivers that, you know, when in doubt, under this policy, they should contact your office?
A Just make a phone call and we'll tell them

running their miles.
We accommodate the best we can in circumstances to get them a hotel, so I guess I don't -- I don't know how to more elaborate that.
Q Okay. I mean, there's some times where employees might be on what's called an unpaid medical leave of absence, and so I wanted to understand what the P.A.M. medical hold entails. Do you understand?
A They run per mile.
Q Okay. What does that mean?
A They get paid per mile.
Q So --
A For every mile they run, they get paid X amount.
Q So for every mile a driver drives, the driver gets paid a certain amount of money?
A They also -- there's like a downtime. You know, I don't deal with that, so --
Q I understand.
If a driver is not driving, the driver isn't getting paid; is that correct?
A In general.
Q In general. And when a driver is on a medical hold, dispatch is not allowed to dispatch



that driver. That's correct; right?
A That is correct.
Q How long generally does it take for an individual or a driver to get off of a medical hold?
A We try to make as quick a turnaround as we can, and we do fairly well. If we have everything we need, they will be cleared in the same -- excuse me -- the same day unless they're hospitalized and there is a compliance requirement.
Q What is the compliance requirement?
A Say if somebody had a heart attack per the D.O.T. regulations, they have a two-month waiting period.
Q Any others that you can think of?
A If they're on a narcotic, we hold them until we ask them to call us back. We explain to them that they can take that narcotic as long as they need, to call us when they no longer need it, and then we wait 24 hours, in general, and then clear them.
Q Is that D.O.T. requirement as well?
A D.O.T. does state medications that would influence driving that -- you know, that they can't drive.
Q Is there a time period where D.O.T. says,



"If you have this narcotic in your system, you can't drive until X number of hours"?
A No.
Q Are there situations where you will shut down a driver if they've been prescribed a medication?
A If it's a narcotic.
Q Any other situations?
A And repeat that. I'm sorry.
Q Where you will shut down a driver if they've been prescribed a medication.
A If it's a medication find that would not be conducive to driving, no.
Q What if the driver isn't taking the medication?
A Why would we shut them down?
Q Well, that's my question. So say, for example, a driver has been prescribed an antidepressant and the driver has decided not to take the medication, would you shut the driver down?
A What we ask is -- what we ask the driver is to go to their doctor and let the doctor know that they're not going to take it.
Q What if the doctor already knows that they're not taking it, but the doctor just thinks it



might be helpful?
A There is in the regulations and company policy, they have to follow the direction of their treating physician.
Q Where is that in the regulations?
A I don't recall at this time, but I know it's also in our company policy.
Q Do you know where that is in the company policy?
A I don't have --
Q If you don't know -- and I'll try to look and see, and I did look at the -- I tried to pull the regulations as well.
A I think in the safety it says that they are required to maintain their health. That is in D.O.T., and then it also says that they are to follow the direction of their physician.
Q So your understanding is that there's company policies or D.O.T. policies, or both, that a driver must follow the directions of a treating physician?
A That is correct.
Q Okay. And so a driver that doesn't follow the directions of a treating physician could be placed on medical hold or shut down?

that was the reason that you didn't have any information on it?
A For me to ask her to pull the actual physical, and what it was discovered is it was a third party that reviewed physicals for us for a short term. We outsourced it.
Q Okay. Who did you outsource it to?
A CMS.
Q And is that the company that's located in Chattanooga, Tennessee?
A That is correct.
Q Do you still outsource that function?
A No.
Q So when you had Kathy pull the physical, what did she have to do?
A She -- it was on scan, and so we just pulled the D.O.T. physical.
Q And why did you have Kathy pull the physical, because, you know, Mr. John Doe contacted you and reported a routine doctor's visit?
A He was telling me he was getting medication, and I wanted to make sure that medication was disclosed on his physical.
Q Why?
A For compliance.



Q Okay. Once you obtained the physical, you know, was that the end of the story? I mean, would that be okay?
A He did disclose one medication, if I recall, on the physical.
Q Okay. Didn't he also disclose that he, you know, had medications that had been prescribed to him because of his condition, his chronic condition?
A I believe on that fax cover sheet, there was, but without looking at that, I can't give an accurate.
Q Okay. So Mr. John Doe contacts you pursuant to the policy; right?
A Correct.
Q Under the policy, he was required to report to your department that he had this routine office visit; right?
A That's correct.
Q And after he reported the office visit, you had Kathy pull his physical?
A Correct.
Q I guess what I'm trying to make sure I understand is: Why did you have her pull the physical just because he was going for a routine



follow-up visit?
A Because he told me he was on medications, he's getting a refill, and I wanted -- because I didn't have access to that information, wanted to make sure that it was disclosed on his physical.
Q Okay. And it indicates further that you advised him that you needed two years' medical records; is that correct? And this would have been August 31st, 2005.
A My normal questioning is, I would ask them how often they go to the doctor -- this may not be recorded, but it's just a routine. I'll say, "How often do you go?" And if he said, you know, "Annually," as an example, or "I go twice a year," I wanted to make sure that he just maintained his health per D.O.T., and that was the reason I asked for two years. It depends on how often they say they go, what we request.
Q And you asked him why he was going to the doctor; right?
A That is correct.
Q And he disclosed that he was HIV positive and he was going for a routine follow-up visit?
A Correct.
Q And you had concerns about his being HIV



positive; correct?
A No.
Q You had concerns about the common symptoms of HIV positive; correct?
A No.
Q You had concerns about the side effects of HIV-positive medications; right?
A The medications.
Q Okay. So you knew about HIV-positive medications; is that right?
A I know that they're -- there's a lot of side effects to the medications.
Q And so you weren't at all concerned about the common symptoms of being HIV positive?
A No.
Q So if it was represented to the Commission during the investigation that you, Janice Brown, was aware of the common symptoms of HIV positive and the common side effects of the HIV-positive medications, you dispute that?
A I don't know that I would say -- I mean -- okay. There -- I just want to make sure that he is main -- okay. I'll take that back. I wanted to make sure he was maintaining his health, and that's why -- that's a medical -- it was getting referred

the company doctor to give clearance for him to continue to drive.
Q So you require the medical records of all of your HIV-positive drivers to ensure that they are compliant with their medications?
A I request records on -- yes.
Q Okay. And once you receive the medical records, you review those to see if they are compliant; is that correct?
A If I see it is compliant, we clear them. If there appears to be something that is -- medically needs to be addressed, we refer it to Dr. Cooper.
Q Okay. So if they're noncompliant with their medications, you believe that there's a problem with their ability to drive; is that correct?
A That's not my decision. I don't make a medical decision. I send it to Dr. Cooper.
Q Why do you send it to Dr. Cooper?
A He's the physician.
Q And you send it to Dr. Cooper, though, for what purpose?
A For medical direction. I'm not -- I don't make medical decisions.



Q What if there was a driver who had been prescribed an antidepressant, for example, and you --
A Uh-huh.
Q Well, I'll just ask you: What happens if they call and say, "Hey, I'm going to my psychiatrist"? Because under the policy, they would have to report that; right?
A That is correct.
Q What would happen next?
A It would depend on if that was the first time we ever had knowledge of it or if we already knew and it was just a followup.
Q Okay. Let's assume that it is a follow-up visit but it's the first time that, you know, your company has knowledge of it because the person just started working for him.
A Okay.
Q What would happen next?
A One, we would look to see if they disclosed it on their physical, and depending on what the medication was, we might request records and refer it to Dr. Cooper, and/or if it's on the list of medications that are disqualifying per D.O.T. -- you know, there's different scenarios for,



you know, for -- for what might transpire.
Q Okay. Are you familiar with depression?
A Uh-huh.
Q And have you had drivers contact you about depression?
A Correct.
Q You've had instances where a driver has been prescribed antidepressants, for example, but has decided, for other reasons, not to take the antidepressant?
A (Witness nods head up and down)
Q Are you aware of situations like that?
A Yes.
Q Is it your understanding that the driver would be shut down because the driver failed to take the prescribed medication?
A We refer them back to their doctor to make that decision. I don't make that decision. That is where it falls under -- our company policy says they will follow the direction of their physician. It's between them and their physician.
Q Well, if the doctor has just recommended that a person take an antidepressant.
A I don't know that they recommended it.
Q Well, if you have the medical records, you



should be able to see that; right?
A If they wrote a prescription for it.
Q Or if they have the medical record, oftentimes you will see, you know, recommended an antidepressant, for example.
A Okay.
Q And that driver might decide not to take that antidepressant; right?
A That is between them and the physician. What we do ask is that the doctor give us a statement that they're not going to take it, and that's okay.
Q So you don't allow the driver just to say, "I'm not taking an antidepressant"?
A That's not following the direction of their physician.
Q So it's your understanding that P.A.M. requires the driver to follow, you know, verbatim --
A It's in our company policy.
Q Okay. But you don't know where that is in the company policy; right?
A It's in our policy book.
Q What does the policy book look like?
A Their driver manual. The driver manual. It's under a safety --

Q So if I had the entire driver manual, we would be able to locate that policy?
A Correct.
Q And this policy would require a driver to follow the directions of their primary treating physician?
A It's under the safety and compliance, that's correct.
Q Okay. Sitting here today, do you know any of the medications that you were concerned about that Mr. John Doe was taking?
A I just know there was a lot of medications. I have no knowledge of this. I don't make medical decisions. I sent them to Dr. Cooper.
Q And what happened next?
A Dr. Cooper reviewed it and he, in turn, forwarded his recommendation. I don't remember if I asked my -- if -- what happens is I normally will contact the driver at that point and find out if they want me to fax or mail the recommendations from Dr. Cooper. I don't discuss it with them, and I tell them that they need to follow up with their treating physician.
Q Okay. But I want to know what happened and you can refer to your notes, and please do.



A Uh-huh.
Q I want to know what happened after that August 31st, 2005, call that John Doe made to you.
A I explained to him I was forwarding his records to Dr. Cooper, and, again, I'll spot check things just to make sure I feel like I have everything so to -- to speed the process, instead of it getting to the company doctor and then realizing that he's going to keep requesting things, I try to get everything that he would need to make an intelligent medical decision so this way we could forward everything to him. And it did show plainly per his doctor that he was noncompliant with taking the regimen of his medication.
That's when I advised the driver I was forwarding his records, and he told me he had a follow-up appointment the next -- on the 29th, or whenever, tomorrow. And then we faxed the records to Dr. Cooper. It looks like I asked Kathy to fax those.
Q Okay. So do you recall in looking at your notes that you indicated to Mr. John Doe that he needed a Return to Work? Is that something that you would have indicated to him that he needed?
A At this point, I don't think I would have



asked that because I didn't have Dr. Cooper's recommendations yet.
Q Okay. So regardless of what his doctor said after he went to that follow-up visit, you still would have wanted Dr. Cooper's input?
A He's the qualified person to do that, yes.
Q So it sounds like, yes, you want Dr. Cooper's input from the moment that Mr. John Doe contacted you and disclosed that he was HIV positive and he had all these medications that he was taking?
A That is correct.
(Exhibit 6 marked for identification)
BY MS. CAMPBELL:
Q Okay. I'm going to hand you a document that we're going to mark as Exhibit 6 and ask that you review the document and look up when you've done so.
A (Witness complies)
Q Have you seen this two-page document?
A I did -- I have. I'm sorry.
Q And just so the record is clear, this is actually two separate documents that have been stapled together. And you would agree that the first one appears to be dated September 2nd, 2005; correct?



A Correct.
Q And the second document appears to be dated 11/18/2005; correct?
A Correct.
Q Have you seen this document that we've marked as Exhibit 6?
A Yes, I have.
Q What is the first page of the document?
A James is clear to drive a truck with no restrictions.
Q When was the first time that you saw this document?
A I don't remember.
Q Okay. Do you know if you received it shortly after he went for his doctor's visit?
A I don't remember.
Q Okay. If you did receive it in your department, would it be recorded somewhere, that this document came in?
A Normally, it is, but with this, because it was Dr. Cooper's file, we would have just forwarded that to Dr. Cooper.
Q Okay.
A Because it was out of my hands at this point. It was basically turned over to Tony and

245

information; correct?
A I only -- I'm only concerned at what we're looking at. If they treat with blood pressure, I'm concerned about their blood pressure, unless it shows they're treating for diabetes.
Q Okay. At some point, Mr. John Doe stopped working for P.A.M., as you know. When was he terminated?
A I don't know the -- oh, I do. It looks like I processed the paperwork on 11/8.
Q And what document are you looking at to --
A Exhibit 5.
Q Okay. So by looking at Exhibit 5, notation 11/8/05, it indicates -- and if you would just read that for the record, that would be better.
A "MedSep paperwork completed as inactive over 30 days along with no contact."
Q What does that mean?
A The driver has not contacted, has had -- has not provided us whatever was necessary to get him cleared. He did not qualify for FMLA, and it's an administrative decision that if somebody is inactive over 30 days and don't quali -- does not qualify, I'm sorry, for FMLA, we process separation, again, with -- they can always rehire or reinstate.

246

Q Okay. So on November 8th, 2005, John Doe was officially medically separated from P.A.M.?
A Correct.
Q Okay. And he was placed on a medical hold September 2nd, 2005; correct?
A September 2nd, correct.
MR. DAMM: Just for the record, it's high noon. What is your schedule?
MS. CAMPBELL: I'm going to try to finish her. I shouldn't have much more.
MR. DAMM: You're going to try to finish her? Finish her off between now and 5:00? Is it -- I mean, you're talking about 10 or 15 minutes? We're trying to coordinate your next witness.
MS. CAMPBELL: Let's go off the record.
(Lunch recess from 11:58 a.m. to 1:08 p.m.)
(Exhibit 9 marked for identification)
BY MS. CAMPBELL:
Q Ms. Brown, before we took a brief lunch break, I handed you a document which we've marked as Exhibit 9, and I'll ask that you look at that four-page document and look up when you've done so.
A (Witness complies)
Q In looking at this document, for the

247

record, can you please describe to me what this document is?
A The first one, that --
MR. DAMM: Go ahead.
THE WITNESS: This is the driver master. Basically, just has their information. This is -- we have access to this to get to our screen, and then this is an HR -- or a driver personnel. They're the ones who set -- or, you know, complete these.
BY MS. CAMPBELL:
Q Okay. So the first page of Exhibit 9 is what's called a driver master?
A Yes.
Q And that's a screen shot for the driver John Doe; is that correct?
A This -- correct. This particular one, yes.
Q And the second page of Exhibit 9 is what?
A It's a driver profile that is also a HR driver personnel screen.
Q And the third page is carryover for the driver profile; is that correct?
A This is correct.
Q And the fourth page, would you identify

248

the fourth page for me?
A I don't know that I've ever seen this screen. These aren't screens that I may -- I don't know that I've ever seen this particular screen.
Q Okay. And before we took a break, you indicated that Mr. John Doe was terminated in November. Do you recall that testimony? November of 2005?
A A --
Q A medical separation?
A It was a termination.
Q Okay. Why does it indicate on Exhibit 9 that his term date is September 1st, 2005?
A Because he didn't qualify for FMLA. That's an HR administration criteria that they put their last day worked, so that's his last day worked. It goes back -- reflects back to their last day worked, even though that's not accurate to the date we process the paperwork.
Q Okay. So the term date was listed September 1st, 2005, reflects his last day of active employment with P.A.M.?
A The day he -- his last day that he actually had been dispatched and driving.
Q Okay. Now, if you look at the third page



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com