# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

vs. No. 2:09-CV-3851

P.A.M. TRANSPORT, INC.,

Defendant.

30(b)(6) DEPOSITION OF ROBERT ANTHONY LONGINOTTI
Taken on Behalf of the Plaintiff
On July 12, 2011, beginning at 10:41 a.m.
In Fayetteville, Arkansas

APPEARANCES:

Appearing on behalf of the PLAINTIFF
Nedra Campbell
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
477 Michigan Avenue, Room 865
Detroit, Michigan 48226
(313) 226-3410

Appearing on behalf of the DEFENDANT
Fritz R. Damm
SCOPELITIS GARVIN LIGHT HANSON & FEARY
535 Griswold Street, Suite 1818
Detroit, Michigan 48226
(313) 237-7401

Reported by: Becky C. Dame, CSR, RPR



INDEX

| | Page |
|---|---|
| Direct Examination by Ms. Campbell | 3 |

EXHIBITS

| Exhibit | Description | |
|---|---|---|
| 1 | P.A.M. Driver Manual Excerpt | 14 |
| 2 | Page 43-44 of the Swift Transportation Company, Inc., driver manual | 27 |



WHEREUPON,
ROBERT ANTHONY LONGINOTTI,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MS. CAMPBELL:
Q Could you please state your complete name for the record?
A Robert Anthony Longinotti, L-o-n-g-i-n-o-t-t-i.
Q And, Mr. Longinotti, we've met off the record. Just for the record, I'm Nedra Campbell and I represent the Equal Employment Opportunity Commission, and, also, for the record, we are continuing the 30(b)(6) deposition of the defendant, and you have been produced to respond to questions as it relates to the 30(b)(6) deposition notice.
A Yes, ma'am.
Q What did you do to prepare for this deposition?
A I reviewed some of the file that I've had on my desk for approximately six years. I've met with Mr. Damm, our attorney, and that, essentially, is my preparation.



Q And you have sat through a number of the depositions in this case; correct?
A Correct.
Q And you understand the general ground rules that we put forth on the record; right?
A Yes.
Q If you need to take a break, please let me know and we'll take a brief break. Okay?
A Okay.
Q As long as there's not a question pending, I don't have a problem with it.
A Okay. Thank you.
Q Also, I would ask that you please remember to give verbal responses as opposed to a nod of the head just so the court reporter to my right can take down everything. All right?
A Yes, ma'am.
Q Okay. And I'll make this deposition as painless as possible.
A Thank you.
Q I want to ask you some questions about the P.A.M. Transport medical hold policy.
A Okay.
Q What is that policy?
A Basically, if we have a driver who

contacts the medical compliance department and informs us that they're either ill or that they're going to a licensed medical provider for treatment, that driver is placed on a dispatch hold, which means he cannot be dispatched in a truck until we receive confirmation that the condition has reconciled, is no longer a safety issue, and that he is still in compliance with the Federal Motor Carrier regulations.

Q Okay. And before we go any further, for the record, what is your title?

A Associate vice president of risk management.

Q And how long have you been the associate vice president of risk management?

A About a year.

Q Prior to that position, what was your title?

A Risk manager.

Q Are these essentially the same types of positions, you just have a title change?

A Correct.

Q Did you get a pay increase?

A Yes.

Q So was it like a promotion?



A Yes.

Q Okay. When did you first start working for P.A.M. Transport?

A September of 2004.

Q When you first started working, what was your position?

A Risk manager.

Q So you worked as the risk manager until approximately last year; is that right?

A Correct.

Q And then you became the associate vice president of risk management?

A Yes, ma'am.

Q Okay. Going back to the medical hold policy, I believe you testified that whenever a driver goes to a licensed medical professional, they would have to report that; is that right?

A That's correct.

Q And would that include going to a doctor for all conditions?

A They do report most of the physician or medical provider visits, but there are instances where they are not placed on hold. The issue -- if a driver indicated they were going for an eye exam, that driver would not be placed on a medical hold.



Q Okay. So if a driver goes on an eye exam, they would not be placed on a medical hold?

A That's correct. They would still have to furnish the office visit notes, but at that particular time, because of just the nature of the treatment, they wouldn't be placed on hold.

Q And is a medical hold the same as a shutdown status?

A Basically.

Q How does a driver get off of a medical hold or a shutdown?

A They would provide us with their condition-specific medical records, and if the records indicated that there were no compliance issues, as far as his current condition, they can be reinstated to active duty status.

Q What do you mean when you say "condition-specific medical records"?

A Well, if we have a driver that goes to a physician complaining possibly of a hernia condition, then we look at the records, request the records specific to his complaint.

Q Are you the one that requests the medical records?

A No.



Q Who requests the medical records?

A That would be our medical review personnel.

Q And who is that?

A Janice Brown is the compliance manager, Leah Wallace, Melissa Priest, Beverly Godfirnon, G-o-d-f-i-r-n-o-n, our medical review personnel, and we have one that is on maternity leave at the present. Her name is Amanda Karras, K-a-r-r-a-s.

Q So you're not the one that's actually requesting the medical records?

A No.

Q So when you say "condition specific," how do you know that the medical records are being requested condition specific as opposed to just going back a couple of years?

A That's what we ask. We ask for condition-specific records. You know, sometimes the doctors will furnish more than what we've asked for, but we're just concerned about that specific condition. We're not looking at family history.

Q So if Janice Brown testified that she would request medical records back for one year, for example, you would dispute that?

A No.

happens with respect to the medical hold or shutdown?
A If we review the records and they appear that, you know, there are no compliance concerns and the medical records indicate the condition for whatever they treated has been reconciled to the point that the compliance has been met, they would be reinstated.
Q Now, let me ask you this: Have you ever asked Dr. Cooper to do a -- perform a physical examination after you all have reviewed the medical records and had him review the medical records?
A No, ma'am.
Q And why not?
A Dr. Cooper is there to render a medical opinion. He's not there to perform medical treatment.
Q Okay. And so you also don't use him to perform DOT medical examinations either?
A I believe he's done DOT examinations in the past, and he still may do some. He doesn't do them for our company at the present.
Q Okay. So let me just understand how the process works.
Dr. Cooper is used solely to review the



medical records once your department has an issue with what you found in the medical records; is that right?
A Correct.
(Exhibit 1 marked for identification)
BY MS. CAMPBELL:
Q Okay. I'd like to ask you some questions about the medical clearance policy. I would ask that you please look at the document that we've marked as Exhibit 1, and look up when you've done so.
A Okay.
MR. DAMM: Just for the record, you're using this as a new Exhibit 1 to Mr. Longinotti's 30(b)(6) deposition or are you using it from --
MS. CAMPBELL: For the record, this is the 30(b)(6) deposition and Mr. Longinotti has been produced. Mr. Roller was also produced with respect to the items in No. 1, and the exhibit that we marked initially is the same exhibit, and I'm asking this witness to look at.
MR. DAMM: Thank you.
THE WITNESS: Can we state on the record, Mr. Longinotti's forgotten his reading glasses.
BY MS. CAMPBELL:



Q Do you have it anywhere in the building or --
A No.
Q Okay.
A I think I can get through it, though. Are you referring to Page 27?
Q Yes. I want to ask you questions about the medical clearance policy.
A Okay. That's a little bit better. Yes, ma'am.
Q Is that policy familiar to you?
A Yes, it is.
Q Do you know when P.A.M. Transport adopted this policy?
A It was in place when I began my employment in 2004. Prior to that, I don't know what the specific date would be.
Q Okay. So you don't know when the company adopted it, but you do know that it was in place in 2004 when you started?
A Yes, ma'am.
Q Do you know who drafted that policy?
A My understanding is Kenneth Hixson drafted the original policy.
Q And is it your responsibility to ensure



compliance with this policy?
A Yes, ma'am.
Q How do you ensure compliance with this policy?
A If there is a question that would come up from one of the medical review clerks as far as a driver meeting his requirements under our clearance policy, I would make that decision if they were unsure as to whether or not, you know, those requirements have been met.
Q Okay. So if there's a question, then, the individuals that you supervised can come to you to resolve that; right?
A Yes.
Q Just for the record, who do you supervise?
A Do you want names or departments?
Q Let me get the departments first.
A Okay. The drug and alcohol random testing department. Cargo claims, Workers' Comp, casualty and property damage claims, medical compliance department, and I'm the risk assessment committee head for the Customs Trade Partnership Against Terrorism Homeland Security Program.
Q Of these departments that you supervise, which departments, if any, are responsible for the

medical clearance policy?
A Medical compliance and Workers' Compensation.
Q Who do you supervise in the Workers' Compensation department?
A Angela Clark and Kathy McCarty.
Q And what are their titles?
A Angela is director of risk management and claims administration.
Q Okay. And Kathy McCarty?
A She's just support for Angela.
Q Okay. And then the medical compliance department?
A Leah Wallace, Melissa Priest, Beverly Godfirnon, Amanda Karras, Debbie Perry, and Janice Brown.
Q And is that the department that Janice Brown oversees?
A Yes.
Q So all the other individuals report to Janice Brown; is that right?
A Correct. They can.
Q Okay. And they can also come to you?
A Yes.
Q Okay. So how do you ensure that the



medical clearance policy is being followed?
A Personnel in the department have had, I would say years of training in the policy. They are familiar with the compliance requirements in the Federal Motor Carrier regulations. We also have the benefit of our medical review officer to assist if there are issues.
The -- most of the people in my department have worked in that capacity with the exception of Ms. Karras in excess of two years.
Q Have any of these individuals, as far as you know, been trained on the Americans with Disabilities Act by you?
A Not by me.
Q Have you done any training on the Americans with Disabilities Act of any of the individuals at all that you supervise?
A We've discussed the ADA and the ADAAA on various occasions. I'm continuously on the EEOC's website, you know, reviewing any new initiatives that are coming out. That information is passed on to my staff.
Q Are you aware of GINA?
A Yes.
Q Have you made any recommendations in terms



of having the policy or any of the policies changed and comply with GINA?
A I believe I distributed a summary of the policy just to make sure that there were not any issues, obvious issues, that would be adverse to that policy. It's been posted. Those are situations which would be probably ultimately referred to Mr. Roller in HR.
Q Okay. Now, going back to the policy, you would agree that it indicates that a driver must report any time a driver seeks medical treatment --
A Yes.
Q -- through a licensed healthcare -- excuse me.
A Yes, ma'am.
Q Okay. Why does P.A.M. Transport require that amount of information?
A It's strictly a process that we've adopted to make sure that the driver is as safe as possible and not a risk to either himself or the general public.
Q But you agree that the company could have got the less stringent requirement; right?
A Yes, ma'am.
Q And under the policy, an individual who



had, for example, herpes and had to go to the doctor, would have to report that to your company; right?
A Yes.
Q What are the penalties if a driver does not report, you know, going to the doctor?
A Well, that depends on individual cases. We have drivers who simply either forget to do it. We will have drivers that will report it, possibly what we consider in a late manner, but it's reviewed on an individual basis.
Q Okay.
A If there is what I would call deliberate intent not to report to us, I would consider that a safety violation.
Q Would the driver get terminated?
A He could be.
Q So a driver could be terminated for not reporting; right?
A Yes.
Q How does the company know if the drivers are adhering to the medical clearance policy?
A Well, most of our drivers are concerned about public safety as well as their own, and they understand it's a company policy which is presented