# EXHIBIT E

A Yeah, I just am not even sure where I'm going with this. I've been pretty focused on a few other things with other clients at this point, so...
Q How much do you charge for your testimony?
A $200 an hour.
Q And I don't know if you can answer this at this point, but what percentage of your income comes from being an expert witness?
A I can't answer that, but I would say -- I can't answer it for sure.
Q You're starting into being an expert witness. I mean, this is your first --
A Uh-huh.
Q -- you know, opportunity; right? Is this something that you would pursue?
A It's not my first opportunity. It's the first one that I've chosen to participate in.
Q Do you consider yourself an expert?
A In the area of highway safety?
Q Yes.
A I do.
Q Where did you attend high school?
A Two high schools, Selma High School in Selma, Indiana, and then it consolidated and I graduated from Wapahani, common spelling, W-A-P-A-H-A-N-I.



It's a Native American term for the White River in Indiana. Anyway, Wapahani High School, 1969.
Q And what did you do next?
A Went to Taylor University, school here in Indiana, three and a half years and graduated.
Q What degree did you obtain when you graduated?
A Bachelor's degree in political science.
Q Poli sci major?
A Yep.
Q What did you do next in terms of employment?
A Okay. I became a member of the State Police in 1974.
Q And you were a member of the State Police for quite some time; right?
A Twenty-nine years and a few months, yes, six months I think, here in Indiana.
Q Have you ever worked for a trucking company?
A No. Well, other than a consultant, but I've never been an employee.
Q That's what I meant.
A Yes.
Q And now I'm going to ask you about the consulting.
A Okay.
Q Have you ever worked as a consultant for a trucking company?



A Yes.
Q Which trucking companies have you provided advice to?
A Do you expect this to be precise or -- I didn't come prepared to answer that. I can tell you some of the names, but I can't tell you all of them.
Q Okay. That's fair. If you could, just identify the names that you recall as we're sitting here today.
A Federal Express; Besl Transfer, B-E-S-L Transfer; Buchanan Rigging. There's another part of that, and I can't remember what it is. Oh, goodness. I've worked for the American Trucking Associations, National Private Truck Council. And within each of those entities, there are individual trucking companies that have called me for advice and counsel. And I'm running out of specific trucking company names at this point.
Q When you were a police officer --
A Yes.
Q And this would have been from, let's see, 1974 up until 2003; is that correct?
A Yes.
Q Did you provide any type of consulting services?
A No.



Q In terms of formal -- or I should say employment. After you left the police business --
A Uh-huh.
Q -- of being a police officer --
A Uh-huh.
Q -- what did you do next?
A I went to work for the Federal Motor Carrier Safety Administration.
Q In what capacity?
A I was the chief safety officer.
Q How did you get that position?
A I went through the OPM, Office Personnel Management, selection process for senior executive service employees and was selected by -- after the President approved it, I was selected to be the chief safety officer in the department by the Secretary of Transportation.
Q How long did you work at the FMCSA in any capacity?
A In any capacity?
Q Correct.
A From June 1 of 2003 till July, I think it was, 19, 2009 -- I'm sorry, January 19, 2009, excuse me.
Q Right around the time of the inauguration.
A You got the connection there. That's the way it works.

were eventually appointed by the White House, approved by the White House and appointed by the Secretary to serve on that to give advice from all the different stakeholder groups in motor carrier-related work. And again, it was a SAFETEA-LU required board so spend a lot of time with that group trying to help formulate policy for trucking regulations in the country.
Q Just so the record is clear, can you identify what you mean when you say SAFETEA-LU?
A I'm sorry. SAFETEA-LU is the acronym for the Safe, Accountable Transportation Equity Act: Legacy for Users. And it's the highway authorization bill that typically is passed every six years. I think right now we're into the eighth extension of that bill. When I was there, it was six extensions. But anyway, that's the bill that governs DOT program funding and authorizes their programs. And so typically any kind of a bill that's passed with highway authorization contains mandates for agencies within the Department of Transportation to enact. And so when I referred to the medical review board, MCSAC, CDL task force, these were all groups that were specified in the statute that we were to create.



Q When you were -- let me ask it this way: The administrator of the FMCSA, is that the top person at the FMCSA?
A Yes.
Q And did you report to the Secretary of Transportation?
A I did.
Q After you ceased being the administrator, what did you do next?
A I relaxed for a while. I formed a company and incorporated here in the state of Indiana and offered my services for transportation-related consulting activities.
Q And is that The Hill Group?
A It is.
Q Do you have any employees?
A I do not. My wife is a shareholder in the company.
Q So you don't have to do any ADA training?
A No.
Q Speaking of the ADA, Americans with Disabilities Act, did you ever get any ADA training while you were a police officer?
A Yes.
Q What did it consist of?
A When the ADA was passed -- can you refresh my



memory what year that was?
Q 1990.
A I was at that time the commander of the motor carrier division in Indiana, which had to do with truck enforcement, the State Police. And in Indiana, unlike some states, the State Police is the only agency that did truck enforcement. So we had that responsibility. And we were in the process of hiring additional inspectors, civilian inspectors to do truck enforcement because of the growth of the motor carrier industry after deregulation occurred. And we had to establish essential functions of the job so that we could make sure that we were in compliance with ADA when we hired those people. So I was involved in making sure that we followed -- I mean, with legal counsel, but I was involved in helping to develop those essential functions and went to training for ADA. I don't remember now who provided it, but we went to pretty extensive training. And I -- and then thereafter we had to have periodic updated training in ADA-related activities and EEOC issues.
Q And I imagine, because you were a police officer, that, you know, Indiana had to make sure that everyone there was qualified to do their job;



right?
A Yes. They have to go through training.
Q And after the training, after you became a police officer, did you have regular examinations, like, physical examinations?
A Yes. We actually had fitness tests for a period of time that we had to complete.
Q Did you ever have any regular medical examinations?
A Not compulsory.
Q What do you mean by that?
A I wasn't required to go to the doctor by the agency, only if there were medical conditions, you know, that existed.
Q So you didn't have to report routine visits to the doctor?
A I'm not sure I understand where you're going with this. As an employee or as --
Q Correct. As a police officer, did you or any members of your staff that you know of have to report, Hey, I'm going to get my physical tomorrow, to the Indiana State Police?
A No. We had a policy that required the employee to notify their commander if there was any kind of condition that would preclude them from being able to do their job, the essential functions of the

employees who look at carriers who are new to the trucking business. They're called new entrants, newly entering in the truck business. So they do new entrant audits on companies and make sure that they meet the minimum requirements before they are given authority to operate in interstate commerce.
 And the third one is the safety investigator. And a safety investigator is someone who may need to occasionally inspect a truck. They may need to know what the auditor -- their knowledge is much more comprehensive. They actually go in and do what they call compliance reviews. And this book that I am holding here is the Federal Motor Carrier Safety Regulations. There's also a body called the Hazardous Material Regulations. And safety investigators go into trucking companies and perform audits to make sure they're in compliance with those regulations.
Q Do they have to drive to get to the locations to perform these inspections?
A In some cases they -- what do you mean, drive to?
Q Meaning, how do they perform the inspections? Where are these inspections located? Do they have to get in the car, federal -- you know, GSA vehicle, for example, and go to a place where



there's a truck sitting and conduct the inspections?
A Well, the safety investigators typically go to a trucking company and they will use either their own car or a government-issued car to do so. And then there are people who report to a border location, for example, southwest. And those people probably drive their own personal vehicles. I'm sure that most of them do. And they have an assigned location. And then the trucks go through a crossing, a border crossing, and they inspect them at that border crossing.
Q Once the FMCSA has decided that a person is capable of being an inspector, is that inspector required to report any type of medical contact she or he might have with a medical professional?
A Only if it involves their ability to perform the essential functions of the job.
Q I think we have covered -- The Hill Group is fairly new and the ADA training that you might have had there you've already had since you are the employee there; right?
 Do you have any partners that you consult with?
A I do.



Q Who are --
A I have --
Q Who are they?
A Oh, my. Well, I have a group that I use that's called, NECS, Incorporated.
Q What do they do?
A Well, they are more -- they provide all kinds of services to motor carriers. They do log auditing. They perform safety audits. They do drug and alcohol testing. So they provide services to trucking companies. And so if I get into a client who needs those kind of services, I refer them to NECS.
Q So they do auditing and drug and alcohol testing?
A Yes. And they maintain driver qualification files under part 391. So they'll go in and perform these functions for a trucking company at -- for a fee because they're very familiar with it. And they can standardize it and makes it easy for the trucking company. There are -- there's a group out of Texas that I work with that do drug and alcohol testing. And I don't think I can recall -- I know the name of the person, but I'm not sure I can tell you his company.
Q What's the name?



A David Saunders, S-A-U-N-D-E-R-S.
Q Any others?
A Oh, probably. I'm trying to think here.
Q These are the two that you can recall as we're sitting here today?
A Yeah, that's right. Is that good enough?
Q That's good enough.
A Okay. All right.
Q Have you done any lectures as, like, the proprietor of The Hill Group?
A When you say lectures, what do you mean?
Q I mean getting up in front of a group of people and talking to them about your area of expertise.
A Many times.
Q And this is just with The Hill Group --
A Yes.
Q -- that we're covering right now.
A Yes.
Q About how many lectures have you done since 2009 until now?
A If I were to tell you, it would have to be a very rough estimate.
Q Is that primarily what you do?
A Well, it's what I did initially. When you leave office and there's no administrator in place,

me again?
Q I absolutely will. Did you review the -- I'll say the declaration of Fritz Kahn?
A Yes.
Q And what other things did you know about the case, the facts about the case in January 2011?
A Okay. Mr. Damm went -- this was on the telephone. And he took me through -- I did not bring my notes for -- from that conversation, but they were handwritten. And I made handwritten notes about the time line from, I think it was, 2005 through that current day to give me some background to the case in addition to Mr. Kahn's report.
Q So you had telephone conversations --
A Yes.
Q -- with Fritz Damm --
A Yes.
Q -- regarding the case?
A Yes.
Q And you had the declaration of Fritz Kahn?
A Yes.
Q Anything else that you can remember?
A In terms of the background for the case?
Q Yes.
A No. That's all that I remember as far as the case itself. There was other -- there were other things that I did in terms of preparing my affidavit, but -- yeah.



Q So this is just with respect to the facts of this case.
A Uh-huh.
Q Okay?
A Uh-huh.
Q So you didn't review the Commission's complaint?
A No.
Q And you didn't review the Commission's amended complaint?
A I became aware of those after the expert report. And he discussed them verbally with me, but I didn't review them.
Q You didn't review P.A.M. Transport's medical clearance policy; is that correct?
A It was -- yes, I saw a copy of that.
Q And this is in January of 2011?
A I don't think -- I think that was in July that I saw that. I was verbally told about it. I knew what the policy stated.
Q What does the policy state?
A That employees who visit a physician before returning to work have to notify P.A.M. of any condition that could affect their driving a commercial vehicle.



Q That is not what the policy states unfortunately.
(Exhibit 3 was marked for identification.)
Q I'm going to hand you a document that has been marked Exhibit 3.
A Okay.
Q I'll direct you to the page number. It's Bates stamped number 28. And ask that you look at where it says, Medical Clearance. Do you see that?
A I do.
Q Have you ever seen this document Bates stamped 28, Bates number 28?
A Yes.
Q Did you see this document in January 2011?
A I believe I saw it for the first time in July.
Q In January of 2011, do you know if Fritz Damm or Mike Tauscher, if they e-mailed you this policy that's contained in document 28 -- I'm sorry, page number 28?
A What date?
Q In January of 2011, were you ever e-mailed the contents of the policy?
A I believe that we discussed it verbally.
Q So prior to July of 2011, you'd never seen the policy?
A That's correct.



Q In January of 2011, what else were you told that the policy required, if anything?
A Just what is contained here. I mean, he referred to this and, you know, told me what was included in it.
Q But you just testified that the policy -- it requires employees who visit a physician to notify the company prior to returning to work if they have a condition that affects their ability to drive.
A Well, can I just read it to you here?
Q Absolutely.
A Yeah. Per company policy -- this is from page that's stamped 28. It's the P.A.M. medical clearance policy. Per company policy, illness or injury needs to be reported to the medical compliance department. If a driver seeks medical treatment through a licensed healthcare facility or medical provider, he or she will need to be cleared through the medical department prior to getting back on the truck. I think that's what I testified to.
Q You testified that an employee who visits a physician must, you know, basically tell their

employer prior to returning to work if the condition affects their ability to drive. So it sounds like you believe that this policy is similar to the policy that you dealt with while you were at the police station as a police officer. Do you understand that this policy requires employees to report any and all type of medical contact she or he has with any type of medical professional --
A Yes.
Q -- regardless of whether it affects their ability to drive, regardless of whether it deals with driving at all?
A Well, do you read the second part of that phrase? It says, Before getting back in the truck, which implies their ability to work. That's what is at work here. The -- this protocol has been established to ensure the safety of our drivers, the welfare of the public in general, and compliance with DOT guidelines and internal criteria of the medical compliance department. Prescription drugs must be reported to the medical compliance department before being allowed on the truck to ensure DOT compliance. It's replete through this paragraph that it's getting back on the truck. So they don't want them driving if



they've got a condition that requires some kind of ongoing medical evaluation that could render them unsafe.
Q So let's look at the second sentence.
A Okay.
Q It says, If a driver seeks medical treatment through a licensed healthcare facility or medical provider, he or she will need to be cleared through the medical compliance department prior to getting back on the truck.
A Uh-huh.
Q Okay. You weren't provided the medical clearance policy in January 2011; right?
A Well, I was told what it was.
Q Right. You were told what it was?
A Yes.
Q You weren't provided any deposition testimony at that time I'm sure because there was no deposition testimony at that time that existed. Okay. So your understanding of what the policy provided was from counsel; is that right?
A Yes.
Q So would it surprise you to learn that if a person has herpes and needs to go get a refill on their herpes medication, she has to go and report that to



the company under this policy?
A Would it surprise me?
Q Yes.
A No, because it says if they visit a licensed healthcare facility, they need to be cleared before they go back to work.
Q So it's your understanding of the policy that a person who has herpes, for example, would have to go and report that to the company --
A No.
Q -- before they get --
A Not report the herpes. They have to report that they were treated by a physician to see whether or not they are capable of driving a truck. I don't think herpes has anything to do with it.
Q Nor would acne medication?
A Well, medication could. In fact, any kind of medication, either over-the-counter or prescribed medication, could have a bearing on their ability to operate a truck. So I would think that the safety people would be very tuned to any kind of medications that the employee is taking.
Q Have you reviewed any deposition testimony in this case?
A I've reviewed no deposition, just the expert



reports.
Q And just so we have a clear record, you have reviewed the expert report of Fritz Kahn; is that correct?
A Yes.
Q You have reviewed the expert report of Dr. Wittels?
A Yes.
Q Have you reviewed any other expert reports?
A No.
Q And you've also reviewed the declaration of Fritz Kahn?
A Yes.
Q Beyond the documents that we've already discussed today, did you review any other documents in forming your opinion as of January 2011?
A Well, I read through several documents from FMCSA, including the safety regulations. And I reviewed medical guidance documents that are published on FMCSA's Web site that include guidance to medical examiners. I reviewed the interpretive guidance that relates to the Federal Motor Carrier Safety regulations that further elucidate what the regulatory text is. And I reviewed the safety recommendations from the National Transportation Safety Board, and I reviewed the medical review

A Yes, that's correct.
Q And that's what the physicians or the medical examiners would be looking at, whether that person meets the requirements as set forth by the FMCSA?
A They should be looking at them, yes, and the guidance, which goes beyond the regulatory text.
Q And the guidance is just something that they can consider; right?
A They can consider but as professionals, guidance is the standard for treatment in the industry, you know, the medical industry. And so if there's a guidance that says you should be doing this in terms of your medical diagnosis, you ought to be following that. It's a de facto standard.
Q Isn't it true, though, that the medical examiner has the person there? They're doing the physical examination --
A Yes.
Q -- so the guidance is something that's like a body of experience with respect to a condition, for example. So the medical examiner can decide to maybe give the person a one-year certificate as opposed to a two-year certificate because FMCSA believes that these conditions should be watched more closely?



A That is one option available to them. It's not the only option, but yes, it's one option.
Q So under the DOT regulations, if a person meets the medical requirements, they would be considered qualified to drive?
A Well, yes, that is true, but you're -- you need to define in my opinion what you mean by requirements.
Q Well, whatever the DOT says. I mean, if a person --
A I would agree with that.
Q -- meets the requirements, then they would be deemed medically qualified to drive. I'm trying to understand the terminology.
A Well, what I'm trying to help you understand is that these regulations were written, you know, at a point in time. I'd have to look up to see exactly what year they were written, but they were written. And then since that time, there have been a lot of medical advances in both treatment and diagnosis. And so what I'm telling you is that people who routinely do medical exams for commercial drivers know that if they get into a situation where there's some lack of clarity, they will consult the guidance and they'll consult FMCSA. And what you have then is once they start peeling back that



onion, so to speak, there may be more indication of what they should be doing than just what the text says.
Q Once a person has gone through this medical examination and the medical examiner reaches a decision --
A Uh-huh.
Q -- and says, Hey, this person is good to go --
A Yes.
Q -- isn't it true that that means that that person's medically qualified to drive?
A Yes.
Q I want to go back to the medical clearance policy, which we've already marked for you.
A Number 3?
Q Yes, Exhibit 3.
A Okay.
Q Now, you just testified that if a person becomes unsafe to drive, then -- or I should say they have a condition that is disqualifying, then they are no longer, you know, basically medically qualified under DOT regulations. Do you recall that testimony?
A I do.
Q With respect to the medical examination -- I'm



sorry, medical clearance policy, it sounds like you didn't have a lot of knowledge about the policy when you drafted your January 2011 affidavit, but --
A I would not agree with that statement.
Q Okay.
A I've testified that I heard verbally what it was. I didn't have it in front of me.
Q Well, you heard verbally from the attorney.
A Well, he's reading it to me, yes.
Q But you didn't have the benefit of any deposition testimony that talked about how the company enforces this policy?
A I didn't know if there was any deposition testimony available at that time.
Q No, there was not.
A Okay. So --
Q So you didn't have any deposition testimony?
A That's correct.
Q And in your report, you've -- I'm sorry. I think it's your affidavit and your report. But I know in your report you have suggested that you believe that the policy is a good policy?
A Yes.
Q The policy, though, is not required by DOT

regulations. You'd agree with that; right?
A I would agree with that, yes.
Q In fact, it's something that you think comports with what the NTSB has -- you know, is pushing for?
A Yes.
Q Greater monitoring?
A Yes. And what -- actually what SAFETEA-LU -- you remember that acronym?
Q I do.
A That SAFETEA-LU required the agency to do in setting up more rigorous medical standards. So it was both NTSB recommendation, but it was also in regulatory text, yes.
Q Would your opinion about the report -- or about the medical clearance policy, I should say, change if you knew that the medical clearance policy applied to any type of medical contact at all with any type of medical profession?
A My concern in my report is directly linked to highway safety -- or driver safety. In other words, can he or she operate the vehicle in a safe manner? That's my concern with any condition.
Q Are you familiar with Swift, a company named Swift?
A Yes, I am.
(Exhibit 5 was marked for identification.)



Q I'm handing you a document that's been marked Exhibit 5. I'd ask that you review the document and look up when you've done so, please. And I'm going to direct you specifically to the medical examination part on the first page --
A Okay.
Q -- and the medical disqualification part on the second page.
A Okay. Let me read through it, please. Okay.
Q Okay. Have you ever seen that policy before?
A I was shown a copy of it by Mr. Damm, and I believe it was in July.
Q Does Swift's policy comport with DOT regulations?
A I think it's a little weak. Your specific question, does it comport with --
Q DOT regulations.
A Uh-huh.
Q Well, let me ask it this way --
A Okay.
Q -- there isn't a DOT regulation that requires a commercial motor carrier to have a policy like the one in Exhibit 5 or the one in Exhibit 3. That's correct; right?
A There's not a regulation.
Q So a company can maintain a medical clearance



policy. A trucking company can maintain a medical clearance policy if they want to?
A That's correct. It's consistent with 390.3. Are you familiar with that?
Q And what is 390.3?
A Well, let's just read it. This is in the general applicability and definitions portion. 390.3, paragraph D, Nothing in subchapter B of this chapter shall be construed to prohibit an employer from requiring and enforcing more stringent requirements relating to safety of operation and employee safety and health.
Q So --
A It's consistent with the regulations.
Q So the Swift policy is consistent with DOT regulations?
A Yes. In fact, I would say that it really is consistent with the P.A.M. policy.
Q You're saying 390.3 is consistent with --
A No, no. I'm saying that the Swift policy is consistent with the P.A.M. policy because it says, Even though a driver may have a valid medical card, if the driver's ability to perform his or her normal duties have been impaired by a physical or mental injury or disease, the driver is required to



get a new medical exam in accordance with 391.45 and approval by the safety compliance department, which is very consistent with what P.A.M. requires.
Q You just testified that the Swift policy was weak.
A I do think it's weak.
Q So why is the Swift policy weak? I'd imagine that -- well, is the P.A.M. policy weak as well?
A No. I think the Swift policy is weak because it doesn't require reporting of treatment to the safety department. In other words, it just says that -- it puts the burden on the driver to comply with it, but it doesn't require them to report something. And that's the way you're going to get compliance with company policy.
Q So you believe that if you require a driver to report any and all type of medical contact with a medical provider, you'll get compliance with the policy?
A No, no, no. It says if -- I'm saying that it needs to be reporting of medical condition, disease, or injury that could affect their driving. That's what the Swift policy says.
Q Right. So they put the burden on the driver. And you are saying that the Swift policy should go further and have them report any type of medical

Q And you just used the acronym CMV. For the record --
A Commercial motor vehicle. Sorry.
Q Thank you.
A Uh-huh.
Q That's fine. Do you understand that under the policy, a driver has to report all of their medications to the company?
A Yes, it does say that.
Q This is not required by DOT regulations, is it? I mean, isn't it accurate to say that they only have to -- well, they can't have disqualifying medications on the truck. That's an absolute prohibition; right? FMCSA --
A Yes.
Q -- deals with that?
A Yes.
Q Does the DOT require drivers to report all their medications to the company?
A No.
Q And the DOT doesn't require drivers to provide medical releases to the company either so they can obtain all their medical records?
A I don't know the answer to that question. Does DOT require it? They're responsible to find out if



there's any condition that could affect their ability to operate a CMV, which is a pretty wide swath of information.
Q What makes you say that? You know, what regulation or what are you relying on that says they're responsible for finding out this information?
A A person subject to this part, part 391, must not operate a commercial vehicle unless he or she is medically certified as physically qualified to do so and accept as provided in paragraph (a)(2) of this section. When on duty, has on his person the original or a copy -- then it goes on to explain what the required -- so the duty is there. They have to be certified. They have to be medically and physically qualified to operate the commercial vehicle. That's why I said that.
Q So how does that mean that the trucking company under DOT regulations is authorized to obtain the entire medical history of a driver?
A Well, those were your words. What I said was that -- you were asking me if DOT requires a waiver -- requires --
Q Releases.
A -- release of information. And I said what they want is any information that has a bearing on



whether or not that person can operate a vehicle. So if it includes certain information --
Q So where is that? What are you relying on to say what you just said? I mean, is it -- I understand that you're saying --
A I just read you part of it. And then --
Q But that goes to medical certification, though; right? It just said medical certification; right?
A But how are they going to be medically certified if they're not aware of information that has a bearing on the person's health or physical ability?
Q Because health and a person's ability to drive are not always the same.
A That's correct.
Q They're not the same --
A I agree.
Q -- quite frequently. A person could be taking herpes medication for 20 years and it have no affect on that person's ability to drive a truck.
A Totally -- I'm sure that's true.
Q So that's what my question is, is, you know, there is no --
A But that doesn't mean you can't ever ask.
Q But there is no DOT regulation that requires a trucking company to obtain medical releases; isn't



that correct?
A What do you mean by medical releases?
Q A release that the driver would sign so that the company, for example, P.A.M. Transport --
A Uh-huh.
Q -- can obtain the medical records of a DOT-certified driver who it employs.
A Well, I mentioned this earlier in my deposition. I'm going to go again to 391.41. It's the exception. It says, A driver may use such a substance, a controlled substance or a drug, if the substance or drug is prescribed by a licensed medical practitioner who, A, is familiar with the driver's medical history and assigned duties and has -- B, has advised the driver that the prescribed substances or drug will not adversely affect the driver's ability to safely operate the commercial vehicle. And then it goes on. It's not -- clinical diagnosis of alcoholism. So how are they going to have that information if they don't know it from -- if the person declares on line -- in -- let's just refer to it.
On the physical form, 391.41, there is a part box two, health history. The driver is to complete this. And they're required to list all medication

JOHN H. HILL
THE HILL GROUP, INC.
P. O. Box 833
Greenwood, Indiana 46142
317-215-4090
317-215-4099 fax
jhill@thehginc.com

**EXPERT REPORT OF JOHN H. HILL**

On or about January 15, 2011, I was asked by Scopelitis, Garvin, Light, Hanson & Feary, PLC to assist their client, P.A.M. Transport, Inc. ("PAM Transport") in the litigation of Case No. 2:09-CV-013851, EEOC v. P.A.M. Transport, Inc. before the U.S. District Court for the Eastern District of Michigan.

In preparing for this report, I reviewed the Declaration of Fritz R. Kahn, Esq., dated 1/4/11, the NTSB Safety Recommendation, dated 9/10/01 and the NTSB Medical Recommendation, dated 9/10/01.

My fee for all aspects of this case is $200 per hour.

**Qualification**

Since January 2009 I have been the principal of The Hill Group, Inc., which provides solutions-oriented consulting services in transportation matters including infrastructure planning, highway safety and security strategies and emergency response assessments/planning. Prior to establishing The Hill Group, Inc., I was the Department of Transportation, Federal Motor Carrier Safety Administration (FMCSA), Administrator from August 2006 – January 2009. My responsibilities included: establishing program policies, objectives, and priorities and developing strategic plans for the accomplishment of motor

Exhibit 1
Witness J. Hill
Date 9-9-11 JR

carrier safety program activities; ensuring FMCSA programs are harmonized with effective international motor carrier programs; working closely with the Secretary of Transportation to improve highway safety, enhancing transportation systems, including border movement of international trade, through integrated Departmental initiatives and in accordance with White House and Congressional mandates; and working closely with authorizing and appropriating congressional committees to implement motor carrier regulatory and safety programs.

Before becoming the FMCSA Administrator, I was the FMCSA Assistant Administrator/Chief Safety Officer between June 2003 – August 2006. My responsibilities included: providing executive leadership over the administration and operations of the full range of FMCSA programs; serving as the Chief Safety Officer – the senior career official for the agency; participating with the Administrator and the Deputy Administrator in establishing program policies, objectives and priorities and in developing strategic plans for the accomplishment of motor carrier safety program activities; ensuring that FMCSA programs and field program activities were carried out in accordance with the policy objective of the Administrator and within established legislative and program requirements; coordinating program and policy decisions for thorough implementation within FMCSA; and maintaining liaison with Federal, State, local, and international associations and agencies to promote and coordinate effective international motor carrier programs. As Chief Safety Officer of FMCSA, the Assistant Administrator made final decisions on

adjudication of civil penalty cases, as well as technical and safety-related matters.

Before my appointments to the FMCSA I was with the Indiana State Police from 1974 to 2003. In 2000-2003 I was the Commercial Vehicle Enforcement Division Commander. My duties included: responsibility for a division of 170 police, limited police and civilian personnel with statewide jurisdiction for commercial motor vehicle safety enforcement; designing and implementing innovative commercial motor vehicle enforcement policy and programs; working on Indiana's Motor Carrier Safety Assistance Program (MCSAP) grant from FMCSA; serving as state's enforcement of federal motor carrier safety regulations and hazardous materials regulations; developing and implementing coalitions with motor carrier safety stakeholders to improve Indiana's commercial vehicle safety performance; developing and approving capital projects for the state's weigh stations and inspection facilities; commercial vehicle related legislative activity in Indiana's General Assembly; and representing Indiana in international safety organizations.

**Opinion**

The Federal Motor Carrier Safety Administration (FMCSA) demands a rigorous standard for motor carriers to ensure compliance with their Federal Motor Carrier Safety Regulations (FMCSRs) which govern driver qualification standards for operators of commercial motor vehicles ("CMVs"). 49 C.F.R. 390.11 states, "Whenever in part 325 of Subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed on the driver, it shall

be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound." FMCSA clearly fixes ultimate responsibility for the safe operation of CMVs on the motor carrier.

Further guidance is provided concerning medical fitness of CMV drivers in interpretative guidance provided by FMCSA to 49 C.F.R. 391.41. These Questions/Guidances include:

> **Question 1**: Who is responsible for ensuring that medical certifications meet the requirements?
> **Guidance:** Medical certification determinations are the responsibility of the medical examiner. The motor carrier has the responsibility to ensure that the medical examiner is informed of the minimum medical requirements and the characteristics of the work to be performed. The motor carrier is also responsible for ensuring that only medically qualified drivers are operating CMVs in interstate commerce.

The strength of the FMCSRs and accompanying regulatory guidance conclude that motor carriers must take preemptive action with drivers when they suspect a violation of the FMCSRs. The FMCSRs further specify that medical examiners making a determination about the medical fitness of the driver for operation of CMVs must "be knowledgeable about driver's functions and whether a particular condition would interfere with the driver's ability to operate a CMV safely." (This sentence is taken from interpretative guidance to 49 C.F.R. 391.41 and question 3's guidance.).

When the FMCSA was created in the Motor Carrier Safety Improvement Act (MCSIA) of 1999 (Public Law 106-159-December 9, 1999), the U.S. Congress expressly stated its purpose. Section 113 (b) reads, "In carrying out

its duties, the Administration shall consider the assignment and maintenance of safety its highest priority, recognizing clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in motor carrier transportation." This was a significant shift of motor carrier oversight from the Interstate Commerce Commission (ICC). Prior to 1994, motor carriers seeking authority to operate in interstate commerce had only to consider the carrier's *willingness* and *ability* to comply with ICC regulations. Section 207(a)(1) of the Trucking Industry Regulatory Reform Act of 1994 (TIRRA) modified the general fitness standard by adding new provisions regarding compliance with *safety* and *financial responsibility.* So specific was this shift in regulating motor carriers of property, that Congress noted in the Congressional Record (140 Cong. Rec. H8442 August 16, 1994) for the **HAZARDOUS MATERIALS TRANSPORTATION ACT AMENDMENTS OF 1993:**

> Subsection 207(a) requires applicants for new or expanded motor common carrier operating authority to transport property other than household goods to make three identified showings. First, that the applicant is able to comply with all statutory, regulatory and ICC imposed safety requirements. Second, that the applicant is able to demonstrate safety fitness under standards developed by the DOT in consultation with the ICC pursuant to Section 31144 of Title 49, U.S.C. Third, that the applicant is able to provide adequate liability insurance or provisions for self-insurance under the financial responsibility provisions of Section 10927 of Title 49, U.S.C.

Also, motor carriers which fail to maintain adherence with the safety regulations may have their operating authority revoked.

This movement from economic regulation to safety oversight was fundamental in the establishment of the FMCSRs, where the driver qualification standards were promulgated. The FMCSA is continuing to expand the medical oversight of CMV drivers through a variety of initiatives. In 2006, the FMCSA's first Medical Review Board (MRB) held its inaugural meeting. The MRB's purpose is to review existing rules and recommend new medical regulations for CMV drivers.

In December 2008, FMCSA published a final rule which required the medical certification process to be linked to the issuance of the driver's commercial driver's license (CDL). Conversely, the rule states that if a driver becomes medically disqualified after the CDL is issued, the medical disqualification will also render the CDL as revoked. A final rule is also expected shortly that will establish a national registry of medical examiners. This provision will require all driver medical examinations to be performed by only examiners with accredited training and current certification. The National Transportation Safety Board (NTSB) has issued numerous safety recommendations to the FMCSA regarding the significance of medical fitness oversight of commercial drivers. *See* NTSB September 10, 2001 Safety Recommendation H-01-17 through -25. (Exhibit A). These recommendations were the result of the investigation of a 1999 twenty two (22) person fatality accident caused by a driver suffering from potentially incapacitating medical conditions that went unreported by the driver and the medical examiner who was unfamiliar with the applicable FMCSRs. The NTSB also prioritizes its

safety recommendations annually in its Brochure titled, "Most Wanted List," found at http://www.ntsb.gov/recs/mostwanted/highwayissues.htm. The 2010 most wanted recommendations pertaining to medical fitness of commercial drivers include:

- Establish a comprehensive medical oversight program for interstate commercial drivers;
- Ensure that examiners are qualified and know what to look for;
- Track all medical certificate applications;
- Enhance oversight and enforcement of invalid certificates;
- *Provide mechanisms for reporting and evaluating medical conditions that arise between required bi-annual medical examinations*;

Each of these Most Wanted list items have been Safety Recommendations since 2001 and on NTSB's Most Wanted list since 2003. *See* "Most Wanted List", pages 5-6 (Exhibit B).

**Opinion Specific to this Matter**

Fritz Kahn, in his affidavit and expert report, relies on the provisions of 49 C.F.R. 391.47 as the sole means for a motor carrier to follow when there is a dispute between the medical findings of a physician for the driver and that of the motor carrier. The duty of the motor carrier is to ensure only drivers who meet the prescribed medical standards operate CMVs. In this matter, PAM Transport requested clarification by Mr. Doe's physicians as to the efficacy of

treatment and whether the driver's failure to follow medication routines was adequate to allow for safe operation of a CMV. Therefore, the burden was not on the motor carrier to follow the administrative requirements imposed in 391.47. Subjecting every one of the more than 500,000 motor carriers in the country to following such an administrative inquiry when they simply needed clarification from a treating physician would be burdensome to the FMCSA, the motor carrier and drivers. PAM Transport did not disagree with the driver's medical examiner finding; it only needed assurance that the examiner's determination that failure to follow prescribed treatment did not jeopardize the qualification status of Mr. Doe.

Mr. Kahn discusses in his report that the driver should not be subject to appellate review without an accompanying physician's examination. PAM Transport was not seeking to subject Mr. Doe to the appellate procedures in 391.47. However, if Mr. Doe believed that P.A.M. did impose an unreasonable burden on him, he was free to follow the provisions outlined in 391.47 – he chose not to avail himself of this administrative review.

In Mr. Kahn's report, he alludes to the sacrosanct nature of the driver's medical examination and intimates that the carrier is obliged to allow the driver to continue operation of the company's vehicles once a medical certification is issued. PAM Transport has a greater burden than to acquiesce to a driver's non-compliance with the safety regulations. Part 390.3 (d) reads:

> "*Additional Requirements.* Nothing in Subchapter B of this chapter shall be construed to prohibit an employer from requiring and enforcing more stringent requirements relating to safety of operation and employee safety and health."

PAM Transport, through their proactive posture on safety oversight, has accomplished without the direct guidance of the regulatory community, policies and procedures that rise to the NTSB's recommended practices to reduce commercial vehicle crashes in the U.S. In my opinion, PAM Transport's medical review policy establishes exactly the sort of mechanism for reporting and evaluating medical conditions that arise between required bi-annual medical examinations that the NTSB has been pushing for since 2001. With regard to crash data, the FMCSA estimates that based on the results of its Large Truck Crash Causation Study (see *Report to Congress on the Large Truck Crash Causation Study,"* March 2006) that there are 3,000 trucks per year involved in crashes where there was either a fatality or serious injury, and the "critical reason" for the crash was the truck driver having a heart attack or other physical impairment, which is the action or event which put the vehicle (s) on a course that made the crash unavoidable, given the driving skills and vehicle handling. In that same study, the FMCSA found that prescription drugs were listed as an associated factor in 17% of the crashes. PAM Transport's medical review policy again has responded favorably to a published statistic which demonstrates an elevated risk related to prescription drugs improperly taken by commercial drivers involved in serious crashes.

July 13, 2011 John H. Hill

# EXHIBIT A

# National Transportation Safety Board

Washington, D.C. 20594

## Safety Recommendation

**Date:** September 10, 2001

**In reply refer to:** H-01-17 through -25

Ms. Julie Anna Cirillo
Acting Deputy Administrator
Federal Motor Carrier Safety Administration
400 7th Street, S.W.
Washington, D.C. 20590

On May 9, 1999, about 9:00 a.m., a 1997 Motor Coach Industries 55-passenger motorcoach, operated by Custom Bus Charters, Incorporated (Custom), was traveling eastbound on Interstate 610 in New Orleans, Louisiana. The bus, carrying 43 passengers, was en route from La Place, Louisiana, to a casino approximately 80 miles away in Bay St. Louis, Mississippi. As the bus approached milepost 1.6, it departed the right side of the highway, crossed the shoulder, and went onto the grassy side slope alongside the shoulder. The bus continued on the side slope, struck the terminal end of a guardrail, traveled through a chain-link fence, vaulted over a paved golf cart path, collided with the far side of a dirt embankment, and then bounced and slid forward upright to its final resting position. Twenty-two passengers were killed, the busdriver and 15 passengers received serious injuries, and 5 passengers received minor injuries.[1]

Despite suffering from potentially incapacitating medical conditions, the driver involved in the New Orleans accident was able to obtain a medical certificate by falsifying and omitting crucial health history information from the examination form. The examiner was able to determine that the driver had heart disease, and possibly kidney disease, but she believed that the Federal regulations did not preclude the driver from obtaining a medical certificate.

Based on its investigation of the New Orleans accident and of other accidents involving drivers with known serious medical conditions who were still able to obtain medical certificates and based on testimony given at the National Transportation Safety Board's January 2000 hearing on commercial driver oversight,[2] the Safety Board has determined that serious flaws exist in the medical certification process for commercial drivers and concluded that:

- Individuals who are authorized to perform medical examinations and certify commercial drivers as fit to drive may lack knowledge and information critical to

[1] For more information, read: National Transportation Safety Board, *Motorcoach Run-Off-the-Road Accident, New Orleans, Louisiana, May 9, 1999,* Highway Accident Report NTSB/HAR-01/01 (Washington, DC: NTSB, 2000).

[2] National Transportation Safety Board public hearing, Effectiveness of Commercial Driver Oversight Programs, New Orleans, Louisiana, January 20 through 21, 2000.

certification decisions. Consequently, drivers with serious medical conditions may not be evaluated sufficiently to determine whether their condition poses a risk to highway safety.

- The regulations on the medical certification of commercial drivers do not reflect current medical knowledge and information and can be ambiguous regarding the conditions that may constitute disqualification.

- The new medical certification form for commercial drivers is a substantial improvement over the previous version and, if used in its entirety and in conjunction with attached instructions, will aid examiners in making certification decisions.

- Not all individuals who are authorized to perform medical examinations and certify commercial drivers as fit to drive are made aware of information sources that could assist them with certification decisions.

- The absence of a process under which every driver medical examination form is reviewed greatly increases the likelihood that medical certificates will be issued inappropriately, thereby allowing medically unqualified commercial vehicle drivers to continue driving.

- In the absence of a mechanism to track all medical certification examinations, a commercial driver with a serious medical condition who is denied a medical certificate by one examiner may be able to obtain a medical certificate from another examiner, thus subverting the purpose of the medical certification process.

- Many drivers whose occupations and serious medical conditions are known to their employers, health care providers, and others are never reported, thereby potentially endangering the drivers themselves and others.

- Enforcement authorities cannot, in most instances, determine the validity of a medical certificate during safety inspections and routine stops because of the absence of procedures or information sources to validate the medical certificate itself.

- The inability to authenticate the information on a medical certificate hampers enforcement authorities in their ability to identify unfit drivers and place them out of service.

As a result of its investigation of medical certification issues, the Safety Board found a number of elements to be critical to the establishment of an effective medical certification program for commercial drivers, as discussed below:

*Qualified Examiners.* Examiners should have specific training for performing examinations to determine the fitness of commercial drivers; in addition, examiners required to be the certifying authority should have a background permitting them to adequately evaluate all common medical conditions or medications for their potential to impair a driver.

*Medical Certification Regulations.* The regulations are updated regularly to permit trained examiners to clearly determine whether to issue a medical certificate to drivers with certain common medical conditions.

*Adequate Guidance.* Potential examiners should receive guidance that permits them to perform a physical examination adequate for making informed certification decisions on a commercial driver. Examiners, if required to be the certifying authority, are given guidance regarding the certification of medical conditions not covered by the regulations. Examiners should have a readily identifiable source of information for specific questions in which the guidance may be inadequate.

*Review Process.* Completed examination forms should undergo at least one review by a trained individual other than the examiner so that certifications issued in error are corrected or prevented. All applications or completed medical examinations on commercial drivers are recorded and reviewed so that comparisons may be made of every subsequent application or examination. This comparison ensures that significant changes in medical information provided through the medical certification system can be adequately evaluated.

*Identification of Invalid Certification.* Law enforcement will be able to establish during safety inspections and routine stops that a commercial driver's medical certification is valid.

*Removal of Uncertified Drivers.* Upon determining the validity of a certificate, law enforcement can disqualify a driver from operating a commercial vehicle. The driver will not be permitted to return to commercial driving until receiving a medical evaluation that establishes that the driver has no potentially impairing or incapacitating medical condition.

*Reporting of Medical Conditions.* Drivers who are found by their employers, their health care providers, or others to have developed a potentially impairing or incapacitating condition between required medical certification examinations will be reported to the appropriate regulatory authority. All potential reporters of such information are aware of and are able to utilize procedures for such reports. All medical conditions discovered through such a reporting process will be adequately evaluated.

The severity of the New Orleans busdriver's medical condition might have been rare, but the situation is not unique. The ease in which the current medical certification procedures can be bypassed virtually assures that some unfit drivers will find their way behind the wheel of a commercial vehicle, endangering themselves and the motoring public.

In addition to identifying problems with the medical certification process, this investigation found that no mechanism exists for identifying drivers who have tested positive for drugs. When the New Orleans driver applied for the position at Custom, he listed his former positions with Hertz Car Rental and Turner's Bus Service, but did not mention positions held with The Regional Transit Authority and with Westside Bus Service, in which he had been dismissed for testing positive for marijuana. He explained the gaps in his employment record by stating that he was a musician in a brass band during those times.

Custom sent requests for information to both Hertz Car Rental and Turner's Bus Service, both of which were authorized by the busdriver. However, Custom did not receive a response

from either company. During his tenure with Custom, the driver underwent a preemployment and three random drug tests with negative results.

Three problems are evident from the events described above. First, the driver was able to avoid negative scrutiny from Custom by omitting parts of his employment history. Second, although Custom obtained the driver's permission to investigate his employment history, it did not receive a response from any of the former employers it contacted. Third, no enforcement mechanism or incentive exists to compel previous employers to comply with information requests.

Although the 1996 notice of proposed rulemaking (NPRM) on new driver safety performance history proposes that prospective employers expand their inquiries into a driver's background, it is still possible for drivers to hide positive drug test results in the manner of the New Orleans driver. Title 49 *Code of Federal Regulations* (CFR) 391.21 requires drivers to provide carriers with the names and addresses of employers from their previous 3 years of employment, including their employment dates and reasons for leaving. However, drivers are unlikely to provide such history when it might limit their opportunities for employment. Additionally, enforcing this requirement is difficult because the only way to detect a false employment history would be to obtain employment information from someone other than the driver.

The April 2001 NPRM on workplace drug and alcohol testing programs issued by the FMCSA proposes that employers ask individuals applying for safety-sensitive positions whether, in the past 2 years, they had ever tested positive on, or had refused to test for, any preemployment drug or alcohol test administered by an employer who subsequently did not hire them. The Safety Board does not believe this self-reporting method will effectively identify problem drivers because drivers are unlikely to provide information that may limit their employment opportunities. Because employees are unlikely to divulge positive drug test results and because prospective employers may not have sufficient employment history or the authority to obtain information from previous employers regarding positive drug tests, the Safety Board concludes that results of tests for controlled substances performed under the U.S. Department of Transportation testing guidelines, even when positive, are often not available to prospective employers, making it difficult for them to make well-informed hiring decisions.

Drivers who own and operate their own commercial vehicles (owner-operators) are required to comply with all the requirements stipulated for both drivers and employers. Owner-operators are thus in the precarious position of overseeing their own substance abuse program. No Federal requirements exist for reporting drivers who have tested positive for controlled substances to any regulatory or certifying authority. Therefore, the only entity with information regarding a positive test is the employer, who, if an owner-operator, may also be the individual being tested. Such an arrangement requires owner-operators who are abusing controlled substances to remove themselves from driving if they test positive for such substances. It seems highly unlikely that owner-operators who are not complying with regulations regarding the use of controlled substances will comply with other sections of the drug testing regulations. Therefore, the Safety Board concludes that the current Federal drug testing regulations cannot adequately identify owner-operators who abuse controlled substances.

A database that records positive drug and alcohol test results and refusal determinations for all commercial drivers would provide an effective way for both employers and certifying authorities to verify and evaluate the drug test history of all commercial drivers. Such a database would allow employers to make more informed hiring decisions and would allow certifying authorities to determine whether a driver has a potentially disqualifying medical condition regarding substance abuse.

Therefore, the National Transportation Safety Board recommends that the Federal Motor Carrier Safety Administration:

Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements:

- Individuals performing medical examinations for drivers are qualified to do so and are educated about occupational issues for drivers. (H-01-17)
- A tracking mechanism is established that ensures that every prior application by an individual for medical certification is recorded and reviewed. (H-01-18)
- Medical certification regulations are updated periodically to permit trained examiners to clearly determine whether drivers with common medical conditions should be issued a medical certificate. (H-01-19)
- Individuals performing examinations have specific guidance and a readily identifiable source of information for questions on such examinations. (H-01-20)
- The review process prevents, or identifies and corrects, the inappropriate issuance of medical certification. (H-01-21)
- Enforcement authorities can identify invalid medical certification during safety inspections and routine stops. (H-01-22)
- Enforcement authorities can prevent an uncertified driver from driving until an appropriate medical examination takes place. (H-01-23)
- Mechanisms for reporting medical conditions to the medical certification and reviewing authority and for evaluating these conditions between medical certification exams are in place; individuals, health care providers, and employers are aware of these mechanisms. (H-01-24)

Develop a system that records all positive drug and alcohol test results and refusal determinations that are conducted under the U.S. Department of Transportation testing requirements, require prospective employers to query the system before making a hiring decision, and require certifying authorities to query the system before making a certification decision. (H-01-25)

The Safety Board also issued safety recommendations to the American Association of Motor Vehicle Administrators, the National Conference of State Legislatures, the American Association of State Highway and Transportation Officials, and the Louisiana Department of Transportation and Development. In addition, the Safety Board reiterated five recommendations from its 1999 bus crashworthiness special investigation[3] to the National Highway Traffic Safety Administration. Please refer to Safety Recommendations H-01-17 through -25 in your reply. If you need additional information, you may call (202) 314-6607.

Acting Chairman CARMODY and Members HAMMERSCHMIDT, GOGLIA, and BLACK concurred in these recommendations.

*Original Signed*

By: Carol J. Carmody
Acting Chairman

[3] For more information, read: National Transportation Safety Board, *Bus Crashworthiness Issues*, Highway Special Investigation Report NTSB/SIR-99/04 (Washington, DC: NTSB, 1999).

EXHIBIT B

http://www.ntsb.gov/recs/mostwanted/highwayissues.htm (This page lists the NTSB Most Wanted List.

This is the Medical Recommendation from the NTSB

# Prevent Medically Unqualified Drivers from Operating Commercial Vehicles

## Objectives

Establish a comprehensive medical oversight program for interstate commercial drivers.
Ensure that examiners are qualified and know what to look for.
Track all medical certificate applications.
Enhance oversight and enforcement of invalid certificates.
Provide mechanisms for reporting medical conditions.

## Importance

Based on its investigations of accidents involving drivers with serious medical conditions, the NTSB has determined that serious flaws exist in the medical certification process for commercial vehicle drivers. Flaws in the certification process can lead to increased highway fatalities and injuries for commercial vehicle drivers, their passengers, and the motoring public.

Many commercial vehicle drivers whose serious medical conditions are known to their employers, health care providers, and others are never reported to the appropriate motor vehicle licensing authorities, thereby potentially endangering both the drivers and others.

Enforcement authorities cannot, in most instances, determine the validity of a medical certificate during safety inspections and

routine stops because of the absence of procedures or information sources to validate the medical certificate. The inability to authenticate the information on a medical certificate hampers enforcement authorities in their ability to identify unfit drivers and place them out of service.

In the absence of a mechanism to track all medical certification examinations, a commercial driver with a serious medical condition who is denied a medical certificate by one examiner may be able to obtain a medical certificate from another examiner, thus subverting the purpose of the medical certification process.

## Summary of Action

On October 3, 2005, the Federal Motor Carrier Safety Administration (FMCSA) announced the establishment of a Medical Review Board (MRB) as required by the Safe, Accountable, Flexible, and Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU). The five members of the MRB held their first public meeting on August 31, 2006, to begin reviewing all current *Federal Motor Carrier Safety Regulations* (FMCSR) medical standards, in accordance with the Federal Advisory Committee Act. The MRB holds quarterly public meetings; the members also work with research panels to examine medical issues affecting commercial motor vehicle (CMV) drivers for the development of new science-based standards and guidelines to ensure the physical qualification requirements for CMV operators. Current topics being reviewed by the MRB include vision and hearing, prescription medications, renal disease, and psychiatric disorders, among others. The FMCSA is currently considering more than 60 recommendations from the MRB to determine whether the agency will initiate rulemakings to revise any of its medical standards.

In addition to its work through the MRB, the FMCSA continues to

develop a National Registry of Certified Medical Examiners (NRCME), an action also required by the SAFETEA-LU legislation. The FMCSA published a notice of proposed rulemaking (NPRM) on the NRCME in November 2008. The NPRM proposes to amend the FMCSR to establish and maintain an NRCME and to require that all medical examiners who conduct medical examinations of interstate commercial motor vehicle drivers complete certain training on physical qualification standards, pass a test to verify an understanding of those standards, and maintain competence by periodic training and testing. In its comments on the NPRM, the NTSB noted a number of continuing deficiencies in the FMCSA's approach, including the continuing potential for insufficiently qualified examiners, the lack of a process to review or track medical certification examinations or decisions, a lack of reporting mechanisms between required exams, and a lack of coordination between data collection processes in this NPRM and in the final rule (further discussed below) merging the medical certificate with the CDL. Assuming that these issues can be appropriately addressed as this rule moves forward, the rule will likely help to ensure that the individuals performing examinations are qualified to do so.

On December 1, 2008, the FMCSA issued a final rule amending the FMCSRs to require interstate commercial driver's license (CDL) holders subject to the physical qualification requirements of the FMCSRs to provide a current original or copy of their medical examiner's certificates to their state driver licensing agency. The rule addresses the ability of enforcement authorities to identify invalid medical certification and to prevent uncertified drivers from driving until an appropriate medical examination takes place. Although many of the NTSB's comments on deficiencies identified in the NPRM preceding this rule were not addressed, including the lack of a process to establish the validity of a medical certificate, the lack of a process for a state to downgrade a medical certification between required exams, and the lack of a requirement

or even permission for a state to maintain the complete examination forms, the NTSB believes that the rule is an important achievement because, at the roadside, law enforcement officials will be able to determine whether a driver possesses a current medical certificate and will be able to take appropriate action if the driver does not.

A decade after the New Orleans, Louisiana, accident that precipitated the issuance of these recommendations, the pace of progress to establish an overall system of driver medical certification remains slow. Nevertheless, the MRB continues to meet regularly to discuss certification standards surrounding various important medical conditions and to make recommendations to the FMCSA about medical standards, and rulemaking is underway to establish the NRCME. The merging of the CDL and the medical certificate should help to improve driver oversight by the enforcement community. Although the initiatives completed at this time will not create the comprehensive medical oversight program for interstate commercial drivers that was envisioned in the NTSB's recommendations nearly 9 years ago, the FMCSA has made some progress toward improving safety.

Of note, the FMCSA has filled its newly created Medical Officer position to provide a high level of medical expertise in transportation issues as the agency moves forward in its efforts to address these recommendations. Although the NTSB did not recommend that such a position be created, the hiring of a qualified individual to lead the FMCSA medical program places the FMCSA in a better position to address the development of the comprehensive medical oversight program recommended by the NTSB.

## Action Remaining

Continue efforts to develop medical certification procedures that

ensure unfit drivers are not allowed behind the wheel of a commercial vehicle. Once complete, these efforts will prevent unfit commercial drivers from endangering themselves and the motoring public.

# Safety Recommendations

**H-01-17 (FMCSA)□Issued September 10, 2001□Added to the Most Wanted List: 2003□Status: Open—Acceptable Response** □Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements: individuals performing medical examinations for drivers are qualified to do so and are educated about occupational issues for drivers. (Source: *Investigation of the Motorcoach Run-Off-The-Road, New Orleans, Louisiana, May 9, 1999.* [NTSB/HAR-01/01])

**H-01-18 (FMCSA)□Issued September 10, 2001□Added to the Most Wanted List: 2003□Status: Open—Unacceptable Response** □Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements: a tracking mechanism is established that ensures that every prior application by an individual for medical certification is recorded and reviewed. (Source: *Investigation of the Motorcoach Run-Off-The-Road, New Orleans, Louisiana, May 9, 1999.* [NTSB/HAR-01/01])

**H-01-19 (FMCSA)□Issued September 10, 2001□Added to the Most Wanted List: 2003□Status: Open—Acceptable Response**□Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements: medical certification regulations are updated periodically to permit trained examiners to clearly determine whether drivers with common medical conditions should be issued a medical certificate. (Source: *Investigation of the Motorcoach Run-Off-The-Road, New Orleans, Louisiana, May 9, 1999.*

[NTSB/HAR-01/01])

**H-01-20 (FMCSA)□Issued September 10, 2001□Added to the Most Wanted List: 2003□Status: Open—Acceptable Response** □Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements: individuals performing examinations have specific guidance and a readily identifiable source of information for questions on such examinations. (Source: *Investigation of the Motorcoach Run-Off-The-Road, New Orleans, Louisiana, May 9, 1999.* [NTSB/HAR-01/01])

**H-01-21 (FMCSA)□Issued September 10, 2001□Added to the Most Wanted List: 2003□Status: Open—Unacceptable Response**□Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements: the review process prevents, or identifies and corrects, the inappropriate issuance of medical certification. (Source: *Investigation of the Motorcoach Run-Off-The-Road, New Orleans, Louisiana, May 9, 1999.* [NTSB/HAR-01/01])

**H-01-24 (FMCSA)□Issued September 10, 2001□Added to the Most Wanted List: 2003 □Status: Open—Unacceptable Response**□Develop a comprehensive medical oversight program for interstate commercial drivers that contains the following program elements: mechanisms for reporting medical conditions to the medical certification and reviewing authority and for evaluating these conditions between medical certification exams are in place; individuals, health care providers, and employers are aware of these mechanisms. (Source: *Investigation of the Motorcoach Run-Off-The-Road, New Orleans, Louisiana, May 9, 1999.*[NTSB/HAR-01/01])