# EXHIBIT F

those are the drivers that would be placed on medical hold if you found any issues?
A That's correct.
Q Okay. So how was it that you would come into possession of their medical physical or how is it that you would be reviewing their medical physical when you place them on medical hold?
A It depends what their -- what the medical issue was. A driver would call in and it would start off by a driver telling his dispatcher I need a few days off for I need to go to the doctor. I mean, that would be a typical scenario. We told the dispatcher do not discuss any medical conditions with the driver. If anyone mentions doctor, medical, whatever, say, I'm sorry, I can't talk to them and transfer them to the medical review department. So literally, they were supposed to put them on hold, transfer them to the medical review department and once we answer it they were supposed to get off the line so they couldn't listen. We kept them on the line so they wouldn't lose the driver, so once the medical review lady answered the phone, they were supposed to hang up and then anything medical would be discussed between the driver and a medical review department lady.



Q Okay.
A And then they would describe their complaint and if it was during the day Angela or Melissa would call me and tell me what's going on and I would make a decision, well, it's okay, not okay, let's get more records and then that medical review person would contact the driver and tell the driver what we needed.
Q Okay. Are you aware of John Doe? I mean, you probably -- I know you probably heard the name, I don't know if you recall the name?
A I don't recall the name. I know the claim. No, I don't know anything about John Doe himself.
Q Okay. Did you ever talk to him?
A No.
Q Do you recall what the charge that he filed with EEOC even says?
A I know there was an issue that he claimed that he was HIV-positive and he was terminated in violation of ADA.
Q I have handed you a document that has been marked as Exhibit 2 and ask that you review the document and look up when you have done so.
(WHEREUPON, Exhibit 2 was marked for



identification.)
A Okay.
Q Have you ever seen this document before?
A Yes, ma'am.
Q Could you for the record please describe this document for us?
A It's a charge of discrimination dated June 5, 2006 signed by John Doe against P.A.M. Transport.
Q And I understand that you were not working as corporate counsel at the time?
A Correct.
Q However, what I would like to know is how is it that a person like John Doe would have been placed on a medical hold?
A A person like John Doe? Any driver who would've called in who said he needed to go to a doctor would have been placed on medical hold until we got a release from the doctor that would satisfy any question we had whether he could drive a truck safely.
Q Okay. So is that under the policy, the medical clearance policy, that they are required to inform the company that they're going to a doctor?
A Yes, that's my recollection of it.



Q Okay. And if you would at this point look at Exhibit 1 and look at the policy?
MR. DAMM: Exhibit 1 has a number of policies. Can you be specific?
Q (BY MS. CAMPBELL) Yes, the medical clearance policy which is page 27, Bates stamped page 28.
A Okay.
Q Did you draft this policy?
A I did.
Q And you'll see the excerpt on the first page of this document says revised May 2005?
A Okay. Let me back up. I don't know if I -- that doesn't really sound quite like my language.
Q Okay.
A But it's certainly very, very similar to what I produced.
Q Okay. So the policy that was in place in I guess -- let me ask it this way. When did you draft the policy initially?
A I don't know.
Q Was it maybe a year after you started working for the company, maybe five years?
A I would guess within a couple years, but that's totally a guess.

Q Do you know if this was a new policy?
A It would be a new written policy. I think it would be the practice before I got there, but I made it a policy and put it in the driver manual.
Q Okay. And when you say the practice, what was the practice?
A Well, I think the practice was that if, again, you go back to Kathy Rogers and with a smaller company back then and if Kathy had known that someone had a medical condition that would affect their ability to drive a truck safely, she would have pulled them off the road. It wouldn't have been called a medical hold, there would not have been the automatic computer system involved, but I'm confident that she would not have let someone drive had she known they had a medical condition.
Q Okay. And how about a routine physical?
A What about a routine physical?
Q Well, you said if a person has a medical condition that could affect a person's ability to drive, that person will be pulled off the road. What if a driver had a routine physical, would the driver who had a routine physical also be pulled of the road and placed on medical hold?



MR. DAMM: I'm sorry, what time frame, counsel?
Q (BY MS. CAMPBELL) 2006.
A 2006, I don't know.
Q How about under the policy that you drafted?
A Are you talking about a renewal physical?
Q No.
A I'm not sure what your question is related to.
Q You were discussing the medical hold and how that whole process works.
A Yes, ma'am.
Q And then I gave you a charge of discrimination from John Doe?
A Yes.
Q And I was trying to understand because I understand if you have a medical condition you get placed on a medical hold. I'm trying to understand what other situations a person is placed on a medical hold and does it include when a driver has a routine physical?
A Well, the phrase routine physical is not a DOT term. I'm not sure what you mean by routine physical. If what you're referring to is the annual



recertification because if you start off with the premise that you can't put them on hold unless they're a driver, that means at some point they should have been qualified. So if you have "a routine physical", all that routine physical could be would be the annual or biannual recertification. And if your question is is a driver put on medical hold for his recertifications, the answer is no. If the recertification physical prompted an inquiry, then the answer could be yes, but the DOT physical, per se, would not be grounds to put someone on medical hold.
Q Okay. And substituting recertification physical, for example, an annual OB/GYN that a female driver might have, would that person be placed on a hold?
A Can you ask that again? I'm not sure what you mean by substituting a GYN.
Q Well, you said you didn't understand how I was using the phrase routine physical?
A Yes, ma'am.
Q And then you talked about if we were talking about a DOT physical, the recertification, then that person would not be placed on a medical hold, right?



A That's correct.
Q So my question to you is what if a female driver had a routine physical with an OB/GYN, would the female driver be placed on a medical hold?
A I'm not sure. It probably depends how much time off they requested. If they had called in and said I'm going to get an annual physical or whatever from my doctor and we got the answer back that day and it was a clear physical, that driver probably would not have been put on medical hold. Or would not have been. If the physical came back or the order came back and it raised a question, then it would be because it's all tied to not dispatching the driver once we knew that she had a condition that could affect her ability to drive safely.
Q Okay. Why was John Doe placed on a medical hold?
A From what the records show, he called in, and this is just my recollection, he called in because he wanted to go see his doctor. I don't remember if he told Janice why or not, but at some point in the process he provided Janice with a list of medications that the side effects on the medications could affect his ability to drive safely

and she wanted Dr. Cooper's opinion. That's my recollection.
Q Do you have any understanding of why he would've provided a list of medications to Janice Brown?
A Whenever he asked for time off to go see his doctor, I think the policy in place at that time was that before he was allowed back on the truck he would have to provide a list of any medications he was prescribed so that the company could be sure that the medication didn't have side effects that would affect his ability to drive.
Q Wasn't it that he disclosed that he had a routine physical for his HIV-positive and Janice Brown had concerns about not only his HIV-positive, but also the medications that people take when they're HIV-positive?
A I don't know.
Q So as --
A I wasn't there at the time.
Q Okay. Going back to the policy that has been marked as Exhibit 1, is that policy required by DOT regulation?
A I don't think it's in the FMCSR. The first paragraph, that 391.41 is -- A is probably



right out of FMCSR. The paragraph below it is not in the regulations to my knowledge. The regulations allow the motor carrier to have more stringent policies and the FMCSRs are the minimum policies.
Q Okay. So the paragraph that starts with per company policy is not required by DOT regulations?
A Not to my knowledge.
Q Okay. Do you know where any revisions to this policy would have been stored when you were working as corporate counsel?
A They would've been on my hard drive of my PC which I'm sure has been melted by now.
Q Okay. Probably inoperable anyways because of technology changes. Mr. Hixon, you've been handed a document that has been marked as Exhibit 3. I'm going to ask that you review that document and look up when you've done so.
(WHEREUPON, Exhibit 3 was marked for identification.)
THE WITNESS: Tony, going for the coffee room?
MR. LONGINOTTI: Yes, I am.
MR. DAMM: Why don't we take a five minute break.



MS. CAMPBELL: Yeah, we can take a quick break.
(Short break from 9:49 a.m. to 9:57 a.m.)
Q (BY MS. CAMPBELL) Okay. Before we took a brief break, I asked you, Mr. Hixon, to review what appears to be an excerpt from a Swift Transportation Company driver manual. Have you had a chance to review that document?
A I did. But before we go to that, I want to go back and not particularly change an answer, but clarify an answer. You asked if a lady would go to an OB/GYN visit would she be put on medical hold and I think that answer is yes. I think my previous answer was it kind of depends on how long it would take and in hindsight I don't think that's right. I'm sure had I been there and that lady called and said I'm going to go in for a "normal routine visit", we would have placed her on medical hold until we got their response back.
Q Okay.
A We would treat that like any other medical condition.
Q So we'll set aside the Swift policy for the time being.
A Okay.



Q Is it once you call in you're placed on a medical hold, how does that work?
A Yes.
Q So everyone is placed on a medical hold when they call in?
A For a medical reason, yes.
Q And this would have been during the time frame of when, the answer that you -- your answer?
A '96 through 2004 for sure. You know, I say '96, '96, '97, somewhere in there. Could even have gone back to '94, but I doubt it.
Q So why would the company place a person on a medical hold for any medical reason?
A We wanted to know whether that driver had any medical condition or symptom or medication that could affect his or her ability to drive safely.
Q Are drivers paid while they're on a medical hold?
A Yes. Well, they're paid per mile.
Q So if they can't be dispatched, then they can't get compensation, right?
A Okay. They cannot be -- if they're not driving a truck, they're not compensated.
Q So when they're placed on a medical hold, they actually are not being paid, right?

the doctor, they'd be placed on a medical hold?
A I think that would be correct.
Q And the decision-maker, and we'll say when you left the company, was who with respect to medical holds?
A Janice Brown. And if she wasn't available, they would call me.
Q Okay.
A I had the authority -- just one or two people had the authority, the password ability to enter the medical hold and I think at that time it was probably just me and Janice.
Q Okay. About how many drivers in a year would be placed on a medical hold?
A No idea.
Q How many drivers did the company have when you left the company?
A Oh, 2000, plus or minus.
Q Thinking back in your last year, would you say you dealt with this issue frequently, the medical hold issue?
A Yes.
Q Were there ever situations while you were corporate counsel for the company where a person would be placed on a medical hold for an extended



period of time?
A Yes.
Q About how often would that happen?
A No idea.
Q Would you be shocked if you -- if there was -- strike that.
Would it happen more than 50 times a year?
A I have no idea. That's why we had the FMLA leave, that's probably in that same driver's manual. We had FMLA leave and you got workers' comp, you know, there's a lot of issues where a driver can be put on medical hold.
Q What happens if a driver is on medical hold for over 30 days, are they then terminated?
A It depends why. If they're FMLA, they're not terminated until the end of the 12 week period and then some other paperwork passes back and forth. If it's workers' compensation, they're not terminated at all, they're just kind of in a pending status until the work comp claim terminates and the physician releases them and returns them back to work. At that point we would require a new DOT physical because they've been off so long. I'm not sure I answered your question.
Q No, you did.



A Okay.
Q Basically, the company did not have a practice or a policy of requiring discharge after a driver has been on a medical hold for 30 days?
A Not to my recollection.
Q Okay. So really it depends on a situation as to whether a person, a driver, will be terminated after they've been on medical hold for an extended period of time?
A Yeah. You know, there was a policy in place where if you didn't contact, if a driver didn't contact his dispatcher within three days or seven days or something, they could be terminated. There is a 30 day policy. I don't remember what it was. I don't think it was medical, per se, but I think the policy was that if a driver didn't contact the company within 30 days, then they were terminated. But you couldn't have a blanket policy like that because a blanket policy like that might violate the FMLA or it might violate the workers' comp laws, so if it came out of the medical side it was always looked at on a case-by-case basis.
Q Okay. Now, looking back at the medical clearance policy, under the policy the company would obtain information regarding a person's medical



condition, correct?
A Yes, ma'am.
MR. DAMM: The P.A.M. policy?
Q (BY MS. CAMPBELL) That's correct.
And would it also obtain information regarding prescription medications?
A Yes.
Q Would it be the practice of the company to obtain medical releases from the drivers?
A Yes.
Q And why would the company do that?
A Well, from the physicians for the drivers, yes.
Q Okay. Right, that's right. So they would ask that the driver provide a medical release and then the company would submit it to the driver's physician so that it could obtain its medical records or his or her medical records?
A Can you ask that again?
Q Sure. The company would provide a release to the driver so that the company could provide the release to his or her physician so the company could obtain the medical records?
A Let me answer it this way. If we got medical records, the driver would have to sign a

The last yellow sticky I don't think I talked about that -- no. Those are the ones I really referred to, but I'm sure there's more in here. I looked at that book one day this week and those four or five little excerpts just kind of jumped out at me.

Q Okay. We have that for the record. The other thing you referred to we'll make Exhibit 7 is a single sheet, page one of 16. It's from OpenJurist and it was the testimony about the case EEOC versus J.B. Hunt. I just ask that be made an exhibit, please. You indicated that it would be "our neck" if there was a violation and you would lose the DOT authority and --

(WHEREUPON, Exhibit 7 was marked for identification.)

A Right.

Q -- any other complications, implications?

A Well, not too long ago, and I think I put this in one of my last responses in this case before I got out of it and you took over, but there was a company down in, I think, Texas, maybe Louisiana, where the company ignored 391.41 and they fined the president and put him in jail.

Q Okay.



A Bob Weaver would not have liked that, so not only did you have personal liability. Then there's a case I think out of Oklahoma, several courts have cited it and I think maybe Harry Blackburn, some Supreme Court justice I think the language, I may not be right, but the quote is something to the effect, woe is the motor carrier who ignores the DOT medical examination and is involved in an accident.

Q And is it the motor carrier's obligation between the times of the mandatory physicals whether it be one year or two years, is it the motor carrier's obligation to make sure the driver is medically fit to get on the truck?

A Yes.

Q And if they don't do that correctly and the trucker is involved in an accident, is there any extra liability on the company?

A In addition to compensatory damages, if I was the plaintiff's lawyer I would be asking for punitive damages.

Q Why is that?

A Well, because you're intentionally ignoring the regulations that were designed to protect the public. I would rather be on the



plaintiff side in that case.

Q And you have testified here today that starting in the mid-'90s, somewhere in there with the changes in the different laws and the due diligence that you did that you were the author of the policy as it was then and as it's evolved to your knowledge, correct?

A I would say it's almost verbatim. It appears slightly changed, but nothing of context.

Q And knowing what you know now, would you advise the company to change that policy in any shape or form?

A I would not make any changes. If a company -- if a motor carrier would ask me to write a policy today, I would cut and paste my old policy and send it to them.

MR. DAMM: I have no other questions.

REDIRECT EXAMINATION

BY MS. CAMPBELL:

Q So just so I understand this correctly, the policy initially at least was created to guard against situations like the one where the woman had the heart attack and drove the truck through the restaurant, right?

A The initial written policy, that incident



probably gave birth to my idea, but I wouldn't say it's the sole factor, but a definite factor for sure.

Q Well, surely after a situation like that the company thought of ways that they could have guarded against that situation in the future, right?

A Yes.

Q Okay. And I know you have testified that the policy requires any type of medical contact, a DOT certified driver must report to the company any type of medical contact?

A Which we expanded to include dental.

Q Right. So you're saying that you would not recommend the company to modify in any shape or form the policy?

A That's correct.

Q So if in the example of the person who is being treated for herpes and needs to go and get her medications, she has to report to the medical review department that, hey, I'm going to get my herpes medication?

A That would be my preference. That would be my policy if I could implement a policy, yes.

Q But you agree that herpes has nothing to do with a person's ability to drive?

P.A.M. policy is not required by DOT regulations?
A It is more stringent than the 391.41 minimum requirements.
Q It's not required by DOT regulations?
A I agree with that.
MS. CAMPBELL: I have nothing further.

RECROSS EXAMINATION

BY MR. DAMM:
Q You agree that the P.A.M. policy is legal and good business; is that correct?
A Absolutely.
MR. DAMM: Other than making exhibits, that's it.
MS. CAMPBELL: We're done.
(DEPOSITION CONCLUDED AT 11:32 A.M.)



C E R T I F I C A T E

I, Kerri Pianalto, Certified Court Reporter do hereby certify that the above-named KENNETH HIXON was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken and transcribed pursuant to agreement, and under the stipulations hereinbefore set out; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 18th day of August, 2011.

KERRI PIANALTO, CCR
State of Arkansas, No. 651