# EXHIBIT H

medical clearance policy? Do you understand that that's what this case relates to primarily?
A. Well, that's what you tell me.
Q. You understand -- go ahead.
A. No. Go ahead. I would like to call your attention, however, to this one statement: Number one, Federal Motor Carrier Safety Administration/Federal Railroad Administration have different issues, union issues, history, whatever. So, I'm not sure that, you know, you're comparing apples to apples. You know, you've got the FAA has its thing, Federal Railroad has its thing, Federal Transit has its thing, and Federal Motor Carrier has its thing. So, I don't think you can really say, well, because it says this for railroad, that means it says that for Federal Motor Carrier.
But I would like, however, to state that after employment begins -- continuing on with this Paragraph 7.2, "After employment begins, an employer may require medical examinations only if they are job related and consistent with business necessity." And I would submit to you that a driver who may not be safe to drive a commercial motor vehicle would be job related and consistent with business necessity, even though it's not under ADA, because it's a safety regulation.
So, I would submit that to you as a general precept that I just don't imagine that the ADA was set up to prevent -- to allow people who aren't safe to operate on



highways.
Q. Right.
A. I mean, I can't accept that. I can't believe that's what happened.
Q. No. And I don't believe that that's what has happened either.
A. Okay. We have no disagreement.
Q. No disagreement with respect to that provision. But it's my understanding that you believe that the DOT allows the medical clearance policy that the defendant has in this case.
A. Well, we haven't really talked about that yet.
Q. Right. But that's your belief.
A. Based upon what I read here, yes.
Q. Okay. I'll get to that. Turning to Page 17 --
A. Got a lot of papers here, Counselor.
Okay. I have it.
Q. What was your input with respect to Page 17?
A. Well, I think we talked our way through this one. Pretty sure that we kind of talked about what my opinion of the -- would be on this and that I thought that the -- that this policy certainly was a reasonable policy that I reviewed. This -- I can't tell you sentence for sentence who wrote what, but I can tell you this does represent my view a hundred percent.
Q. Okay. Now, turning to Page 18, which is the page



that includes the medical clearance policy, what is your understanding of what the policy requires?
A. Well, the policy requires a driver who seeks medical treatment to report back to the medical compliance department what the -- you know, what happened and if this individual -- if it was going to interfere with the ability to safely operate a commercial motor vehicle.
Q. Okay. So, I think you just said a bit. The policy requires a person who's had any type of treatment -- medical treatment or any type of contact with a medical professional to report back to the company; is that right?
A. Well, it says that illness or injury needs to be reported to the medical compliance department.
Q. Okay.
A. And, therefore, if the person seeks medical treatment -- if I call my physician up for something non-medical, I don't need to talk about that; but if it's a medical treatment, then I need to report it to the medical compliance department so that they would be able to determine whether or not this is going to impact the health and safety of that driver.
Q. Okay. Let's take this -- we'll take it sentence for sentence.
A. Okay.
Q. The first sentence reads "Per company policy, illness



or injury needs to be reported to the medical compliance department." See that?
A. Yes.
Q. And you're an expert in DOT regulations, right?
A. Well, I've read them.
Q. Is this first sentence required by DOT regulations?
A. It is not required.
Q. The second sentence says "If a driver seeks medical treatment through a licensed health care facility or medical provider, he or she will need to be cleared through the medical compliance department prior to getting back to work."
Is this sentence required by DOT regulations?
A. There are a number of companies who have interpreted this in several -- in different ways, but the Federal Motor Carrier Safety Administration allows that to occur based upon setting more stringent requirements and being responsible for the health and safety of its drivers, in my opinion.
Q. Okay. Does this sentence that starts with "If a driver seeks medical treatment" -- I'm sorry. Is this sentence required by DOT regulation?
A. No.
Q. The third sentence reads "This protocol has been established to ensure the safety of our drivers, the welfare of the public in general, and compliance with DOT guidelines and internal criteria of the medical compliance department."

Is this sentence required by DOT regulations?

MR. DAMM: I'm sure -- that presumes something. This man's not the author, but it's talking about the protocol has been established. He has no knowledge other than reading the English language.

Q. (BY MS. CAMPBELL) So, you would agree that the sentence -- this sentence contained in the medical clearance policy is not required by DOT regulations?

A. What I'm going to tell you is that this policy is not prohibited by the Department of Transportation.

Q. And --

A. That's different than saying is it required. It is not prohibited.

Q. Okay. It's not prohibited, and it's also not mandated.

A. What's mandated is that the company is responsible for the health and safety of its drivers. What's mandated is that the company cannot allow a driver who is impaired or could be impaired to drive a commercial vehicle. What's mandated is that the medical review officer who now looks at the medications that a driver's on, even if not illegal, even if there is a prescription for them, is now obligated to contact the designated employee representative or the physician representing the carrier to report this as a potential safety worry and that the company has to do something about it. Very



important new information.

So, in that respect, yes, they are moving towards this kind of thing where, yeah, you better be taking medicine that is not going to be disqualified or not be a safety risk, even though it's not at that -- that's it.

Q. So, the medical clearance policy is not prohibited by DOT regulations, and it's not mandated by DOT regulations either.

A. What's mandated is that the company assumes responsibility for these drivers. How they carry out that responsibility is, in my opinion, left to the carrier. I can't tell you who wrote this policy. I can tell you that based upon what the DOT has said, there is nothing here that is prohibited by the Department of Transportation. And it's not like every illness. It's talking about those illnesses that can affect the health and safety of the drives.

Q. Where does it say that on the policy?

A. "This protocol has been established to ensure the safety of our drivers, the welfare of the public in general, and compliance with DOT guidelines and internal criteria of the medical compliance department."

So, what it's saying is we're interested in safety here. This policy is regarding safety.

Q. Do you have any knowledge regarding how this policy is put into effect?



A. No.

Q. So, you don't have any facts regarding how the policy is in effect at P.A.M. Transport.

A. I'm -- I apologize. Just what I read here.

Q. Okay. Are you aware that you'd have to report any type of medical contact that you might have with a licensed medical professional?

A. Well, as I said, I'm not sure how this is operationally taken care of. So, you know, if that's what it is, that's what it is.

Q. Well, let's assume that you have to report any type of medical contact with a licensed medical professional to the company, okay?

A. Okay.

Q. So, for example, you'd have to report the fact that you went to the doctor for a routine OB/GYN physical.

A. Well, again, we're talking about the company policy; illness or injury needs to be reported to the medical compliance department. Now, whether they define a routine OB/GYN examination as an injury or illness is something I do not know.

Q. So, are you reading this policy to suggest that the second sentence relates back to the first sentence or the --

A. Well, if the driver seeks medical treatment, then they would have to notify the medical compliance department. I



have not -- what I said was that a routine yearly OB/GYN evaluation may not really fall under treatment as such. I don't know. I mean, I don't know how they carry out the policy. You'd have to ask P.A.M. about that. I don't know. I just can't speculate because I don't know if that's considered an illness or an injury.

Q. So, are you reading the policy to suggest that the first sentence relates to the second sentence; meaning, like, the illness or injury relates to the medical treatment?

A. "An illness or injury needs to be reported to the medical compliance department." That's one sentence. If you're injured or ill, you've got to report that. I -- that's what it says.

"If you seek medical treatment through a licensed health care facility or medical provider, you'll need to be cleared through the medical compliance department prior to getting back to work." So, basically, I assume if they're seeking medical treatment, they need that treatment, the underlying disease treatment, they had to be cleared before returning to work.

Q. Is your opinion based on your understanding that if you are, you know, seeking this treatment for some sort of underlying disease, you'd have to be cleared to return to work?

A. It sounds like it, that if the guy receives medical -- seeks medical treatment, he would have to be cleared

prior to getting back to work. Now, maybe it's an ongoing medical problem, maybe it's the first time, maybe it's the twentieth time. I don't know.
Q. Well, going back to a person who has a routine OB/GYN, do you understand under P.A.M.'s policy, the way they put it into effect, a driver has to report that?
A. I do not know that. I mean, I just don't know if that's considered illness or an injury or medical treatment. I don't know.
Q. Okay. You're a physician. Do you honestly consider a person going to get a Pap smear an illness or an injury?
A. No.
Q. You're saying you don't know that?
A. I don't know -- I don't consider that to be an illness or an injury. No, I don't. Pap smear comes back positive, I consider that to be an illness or -- illness, but I do not consider getting a routine preventive care as an injury or an illness. Now, I don't know how P.A.M. interprets that. That's all I'm saying. I don't know how they do it. I tell you what I think about it, but P.A.M. didn't ask me when they made this policy.
Q. Okay. And while P.A.M. might not consider it to be an illness or injury, it certainly would fall under the -- if a driver seeks medical treatment through a licensed health care facility or medical provider because a woman is going to a



doctor for a routine physical.
A. Again, I do not know how P.A.M. is treating that and -- I just don't know.
Q. Okay.
A. If I knew, I would certainly tell you. I do not know.
Q. So, DOT regulations don't require P.A.M. to have a policy that would require a woman going to get a routine OB/GYN to report it.
A. Not to my knowledge.
Q. Now, you've indicated further along on Page 18 that medical treatment or issuance of a prescription are, in your opinion, a proper criteria.
A. Uh-huh.
Q. What did you mean by that?
A. Well, an individual who receives a prescription for a medication, you really would need to know what that medicine was to see, A, if that medicine has any consequences to driving or, B, could indicate an underlying condition that could be a problem with driving.
Q. So, it's your view that a motor carrier would be entitled, for example, to know that a driver has been diagnosed with herpes and is taking herpes medication?
A. Well, I think that the medical part of P.A.M. -- medical people, confidential, kept in a separate folder,



etcetera, etcetera -- would -- let's say could get that information. That doesn't mean that they're going to act on it, disqualify the driver, or get other information. It depends upon the situation.
Q. Is it required by DOT regulations?
A. All that's required is that the company's responsible to make sure the driver -- I mean, the guy has CNS herpes, he's not going to be able to drive well and -- or if he's blind -- going blind because of eye infection because of it or it's a symptom of an underlying autoimmune disease.
So, there -- in other words, I think when you use the words like "cancer" or "HIV" and "herpes," you have to put it into context to the situation in which it occurs. You can't just say, "Well, would you disqualify or not disqualify somebody with herpes?" I don't know. Tell me about it. Tell me about -- guy's got cancer. "Oh, my gosh. Tell me about it."
"Well, he got a skin cancer they took off five years ago. Can he drive a truck?"
"Yeah."
Q. We're not talking about a disqualification because we're talking about drivers who have already gone through the qualification process who are DOT certified drivers. So, they're driving for P.A.M. It's my understanding this policy relates to drivers for P.A.M. You understand that, right?



A. Yes.
Q. Okay.
A. But if a driver has developed a condition which would present a threat to the safe -- his health and safety or the health and safety of the people on the highway, P.A.M. is responsible for that driver and, therefore, in my opinion, has a right to know about it.
Q. And so I'm asking you -- we were talking about herpes. I'm asking you if that's required by DOT regulations.
A. I'm not doing a good job, and I apologize. Look, if a person has herpes, a fever blister -- if I were in the medical compliance department and someone said, "I have a fever blister. They gave me acyclovir and I'm doing fine," my response was, "Fine. Have a good trip."
If he says, "I have herpes and I have encephalitis from it," my response is, "You can't drive."
Q. When you talk about medical treatment here -- and it says "Medical treatment" -- and says "Medical treatment or issuance of a prescription are, in my opinion, a proper criteria," what are you referring to when you talk about medical treatment?
A. Well, I would talk about the treatment of an illness or injury with medication -- medical or surgical treatment.
Q. So, you are not talking about routine physicals.
A. Well, I don't know what P.A.M. is talking about, but

I'm not.
Q. Okay.
A. I wouldn't.
Q. Why not?
A. Well, because I think that regular preventive examinations are different than a person who has an injury or illness.
Q. Want to turn to Page 19 and ask you the same questions that I've been asking you. Can you tell me what input you might have had with respect to Page 19?
A. Let's see. Let me look at Page 18 because it kind of starts over there, doesn't it?
Okay. "Nothing in the Federal Motor Carrier safety regulations mandates that every inquiry into a driver's medical condition or prescription usage requires an actual hands-on physical examination by a medical examiner." We can resolve most these by phone.
"Indeed, given the hundreds of thousands of drivers subject to" -- and there are -- I don't know -- 6 to 8 million commercial drivers -- "physical qualification requirements, requiring actual physical examination by an examiner every time there's a question about treatment of a medical condition or issuance of a prescription would bring the regulated transportation industry to a grinding halt, as well as causing inordinate expense to motor carriers," dah, dah,



dah.
So, that basically what they're saying is that let the driver report it to us. We'll see what he's taking, what his problem is. Maybe we'll call -- I assume we'll call the treating doctor and see what the doctor -- if there's an issue, we'll call up the treating doctor, we'll get his input into it. And then if there's still an issue, then we're going to have to go farther.
Q. Okay. Now, going further on Page 19, you said the process used by P.A.M. Transport is, in your opinion, well thought out to be initially at least intrusive -- I'm sorry -- as least intrusive as possible.
A. Uh-huh.
Q. What did you mean by that?
A. Well, there's several ways you can go about getting this information. And what you are really doing is you're saying to the driver, "You're responsible for letting us know treatment or injury or illness to a very selected segment of the community, P.A.M. community, the P.A.M. company."
Getting information from people could be -- you know, I'm not really interested in the results of your usual exam, but if they discover something which requires treatment or which requires ongoing care which could be a risk, we need to know that.
Q. And this statement is based on your understanding of



what medical treatment is, correct?
A. Well, it's in the -- it's my understanding of what I think the policy represents.
Q. Okay. And you did not review the deposition of Janice Brown.
A. I don't know who Janice Brown is.
Q. Okay. You did not review the deposition testimony of Dr. Craig Cooper.
A. No. So, I can't tell you the operational part of this. All I can tell you is just by looking at it, here's what I think.
Q. Okay. So, by looking at the P.A.M. policy and your personal understanding of what it might mean.
A. Well, I mean, I can interpret the P.A.M. policy as strictly or as loosely as you want. I think it's a reasonable policy to deal with the issues it's trying to deal with. That I can tell you.
Q. Despite the fact that the way it's applied and the way it reads, arguably, a driver would have to report any type of medical treatment to the company, including routine visits.
A. Well, again, we go back to I do not know whether a routine well woman OB/GYN appointment is required to be reported to the company or not; if there is an illness or injury or not, whether this is considered an illness or a injury or a medical treatment. So, I would have to defer to



whoever wrote the policy and whoever is responsible for doing the policy, how they would define it. I don't know.
MS. CAMPBELL: We're going to go off the record.
(Recess from 3:54 p.m. to 4:05 p.m.)
Q. (BY MS. CAMPBELL) We were off the record for about ten minutes. And talking about Page 19 of the expert report, if I could refer you back to that. I won't say a few more questions. I have more questions.
Let me ask you this: You talk about the process used by P.A.M. Transport, but it sounds like you didn't read the deposition transcript of Janice Brown. What do you know about the process that P.A.M. Transport uses?
A. I just know about what the statement is in terms of here is their policy. If they enforce it very strictly, that any time for whatever reason you see a practitioner, you have to report it. Or they have certain exclusions; well, if you go for a well woman exam or something, you don't have to. I don't know. Either way, the policy seems to me to make good sense in terms of making sure the driver is safe and healthy to drive.
But I can't tell you, since I didn't write the policy and I have not reviewed the deposition of these individuals, what the operational part of the policy is.
Q. Okay. And going down to the last paragraph on Page 19, it talks about during the medical clearance inquiry process, P.A.M. Transport institutes a medical hold on drivers.

ELLISON H. WITTELS, M.D., F.A.C.P.
2929 Buffalo Speedway, # 1701
Houston, Texas 77098
(281) 216-4319
(713) 622-7466 fax
ewittels@sbcglobal.net

**EXPERT REPORT OF ELLISON H. WITTELS, M.D.**

On or about July 8, 2011, I was asked by Scopelitis, Garvin, Light, Hanson & Feary, counsel for P.A.M. Transport, Inc., to assist in the litigation of Case No: 4:09-cv-013851, *EEOC v. PAM Transport, Inc.*, pending in the U.S. District Court for the Eastern District of MI. As a Board certified internal medicine practitioner, a Fellow of the American College of Physicians, and a Board certified Occupational Medicine physician who has been involved in the examination of commercial motor vehicle (CMV) drivers for may years, including consulting with the Office of Motor Carriers, Federal Highway Administration, and its successor, the Federal Motor Carrier Safety Administration where I was Senior Medical Consultant for five years, on examination criteria for CMV drivers, consulting with interstate motor carriers on CMV driver physical examination criteria and processes, and authoring books on the medical certification of commercial drivers, it is believed I can provide expert advice concerning the U.S. Department of Transportation, Federal Motor Carrier Safety Administration (FMCSA) regulations, their underlying interpretations and guidances, and the processes relating to the physical qualification of drivers of CMVs and their medical examinations.

EXHIBIT
tabbies
WITTELS 1
08-30-11 SMH

In preparing this report I have reviewed: (1) EEOC's First Amended Complaint, (2) the Answer of PAM Transport, Inc., (PAM) and its Affirmative Defenses, (3) PAM's Motion to Dismiss, or in the Alternative, for Summary Judgment, the supporting Memorandum and its attachments, Exhibits A through S, the EEOC's Response and PAM's Reply, (4) relevant portions of PAM's Driver's Manual, (5) the Expert Report of Fritz R. Kahn, Esq., (6) the Code of Federal Regulations pertaining to the FMCSA's Physical Qualification of CMV Drivers and their medical examinations, as well as the related interpretations, guidances and frequently asked questions and the FMCSA's Office of Medical Programs publications and the proposed National Registry of Certified Medical Examiners (NRCME) program.

I am being compensated at the rate of $250 per hour for research reports, conference time and preparation, $300 per hour for deposition and trial testimony and $200 per hour for waiting time.

**QUALIFICATIONS**

I received my undergraduate degree from the University of Oklahoma in Norman, Oklahoma, and my MD degree from the University of Oklahoma School of Medicine in 1968. I also attended the University Of Texas School Of Public Health in the early 1990s. I interned at Cincinnati General Hospital in Cincinnati, Ohio, completed a residency at the University of Oklahoma Medical Center and did a fellowship in pulmonary disease at the University of Oklahoma Medical Center. I also was an Associate Professor of Medicine and

Chief of Occupational Medicine at Baylor College of Medicine in Houston, Texas.

I have Board certifications from the American Board of Internal Medicine (1972), the American Board of Preventive Medicine and Occupational Medicine (1993), am a Fellow of the American College of Physicians (1996), certified by the International Board of Underwater Medicine in Diving Medicine (1997) and have been a certified Medical Review Officer by the Medical Review Officers Certification Counsel (1994, 1999 and 2005).

I have numerous academic and professional appointments which are listed in my attached Curriculum Vitae. Among these I was a consultant for the Federal Highway Safety Administration (1995-2000), and a consultant to the Federal Motor Carrier Safety Administration (FMCSA) (2000-2005). I was a Chairman of the Cardiovascular Advisory Panel for the FMCSA (2001-2002). I was a representative of the FMCSA to the American Association of Motor Vehicle Administration (2005-2008). I was a Senior Medical Consultant for the FMCSA (2005-2009). I was a medical consultant to the U.S. Coast Guard, Office of Homeland Security (2007-2008). I was a medical consultant to the Doctor's Task Force for the Federal Railroad Administration (FRA)(2007-2009). I was a member of the Medical Advisory Committee for the International Brotherhood of Teamsters (1988-2005). I was a member of the Association for the Advancement of Automotive Medicine's Committee on DOT Regulations (1994). I was part of the Medical Standards Project Advisory Group for the Federal Highway Administration (1995). I was a member of the Committee on

Guidelines for Elderly Drivers for the U.S. Department of Transportation (1996). I was the Concentra Director for the Continuing Medical Education (CME) Program regarding Medical Certification of Commercial Motor Vehicle Drivers (2005-2009). I have been employed from 2000 to the present as a senior physician with Concentra Health Services and have been the Director of the Concentra Information Line for Examiners for Medical Certification of Commercial Drivers from 2005-2010.

I have been a Medical Consultant for Ruan Transportation (2001-present), Greyhound Lines, Inc. (2006-present) and Waste Management, Inc. (2007-present); all these companies are US DOT interstate motor carriers.

I was a consultant for the American Association for the Advancement of Automotive Medicine regarding the Criteria for Medical Fitness to Drive (1995). I was awarded a research grant to be the Principal Investigator for the US Department of Transportation regarding Anticoagulant Therapy and Commercial Drivers (1995-1996).

I have published or co-authored numerous articles including:

*Criteria for Anticoagulation Treatment of Commercial Drivers, Report to the Office of Motor Carriers*, Federal Highway Administration, March 1996;

*Federal Motor Carrier Safety Administration Cardiovascular Advisory Panel Guidelines for Commercial Motor Vehicle Drivers*, 2002;

*Medical Standards for Railroad Workers, Final Report, US Dept. of Transportation*, Federal Railroad Administration, January 2005;

*Medication Uses and Large Truck Crash Involvement*, Final Report for the US Dept. of Transportation Federal Motor Carrier Safety Administration, January 2008; and

*DOT Medical Certification Exams for Commercial Drivers* for the Journal of Urgent Care Medicine, September 2010.

I have also published two books on medical certification of commercial drivers:

*The Concentra Care Guide to Medical Certification of Commercial Drivers*, COHRI Press, San Antonio, 2004; and the

*Concentra Guide to Understanding Commercial Driver Medical Certification for Safety Officers, Human Resources and Other Administrative Personnel*, COHRI Press, San Antonio, 2006.

Among my duties as a consultant for the Federal Motor Carrier Safety Administration from 2000 to 2009, I have advised on the criteria used for the physical examination of commercial motor vehicle drivers as required by 49 CFR § 391.41, et seq. This included, among other things, report to the FMCSA regarding CMV driver medication usage as it relates to large truck crashes. The purpose of this study was twofold, first to analyze the large truck crash causation study (LTCCS) data to estimate the usage of potentially impairing over the counter and prescription drugs among drivers of large trucks involved in crashes, and second, to explore the relationship between drug usage by the driver and the risk of assignment of the critical reason associated with the crash.

Throughout my professional career, in addition to the activities listed in my Curriculum Vitae, I have endeavored to keep myself up to date on numerous topics relevant to my professional career. For almost the last twenty years, this has specifically included the physical qualifications, and the medical

examination of, drivers of commercial motor vehicles. As a consultant to the FMCSA, I have helped create some of the criteria used in the physical examination of CMV drivers pursuant to the Code of Federal Regulations. I have also been actively involved as a medical practitioner in the application of these criteria as well as all of the other applicable criteria to the physical examination of thousands of CMV drivers over the last almost twenty years.

**OPINION**

The FMCSA has been charged with ensuring the safe operation of commercial vehicles upon the nation's highways. 49 USC § 113(b) declares:

> "In carrying out its duties, the Administration shall consider the assignment and maintenance and safety as the highest priority, recognizing the clear intent, encouragement and dedication of Congress to the furtherance of the highest degree of safety in motor carrier transportation."

In furtherance of that goal, the FMCSA has regulations (the Federal Motor Carrier Safety Regulations, or "FMCSRs") which assure that commercial motor vehicles are driven by drivers who can operate their vehicles safely. The regulations state:

> "No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness or other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle." 49 CFR § 392.3 (emphasis added).

Additionally, 49 C.F.R. 390.11 states, "Whenever in part 325 of Subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed on the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor

carrier is a driver, the driver shall likewise be bound." FMCSA clearly fixes ultimate responsibility for the safe operation of CMVs on the motor carrier.

Further guidance is provided concerning medical fitness of CMV drivers in an interpretative guidance provided by FMCSA to 49 C.F.R. 391.41. These Questions/Guidances include:

> **Question 1**: Who is responsible for ensuring that medical certifications meet the requirements?
>
> **Guidance:** Medical certification determinations are the responsibility of the medical examiner. The motor carrier has the responsibility to ensure that the medical examiner is informed of the minimum medical requirements and the characteristics of the work to be performed. The motor carrier is also responsible for ensuring that only medically qualified drivers are operating CMVs in interstate

In my opinion, it is inherent in the regulations that the motor carrier who may not require or permit a driver to operate a commercial vehicle when their ability or alertness is impaired or likely to become impaired is granted the authority to inquire of drivers as to their ability or alertness.

The FMCSRs further state:

> "A person shall not drive a commercial motor vehicle unless he/she is qualified to drive a commercial motor vehicle". 49 CFR § 391.11(a).

The physical qualification regulations for CMV drivers in interstate commerce are found at 49 CFR § 391.41. Instructions to medical examiners performing the physical examinations are found at 49 CFR § 391.43. The advisory criteria under 49 CFR § 391.41 are recommendations and they are

accessible at FMCSA's website at http://www.fmcsa.dot.gov/rules-regulations/administration/medical.htm. The FMCSA has also published medical conference reports as recommendations to medical examiners to assist examiners in determining whether a driver is qualified under 49 CFR § 391.41(b); these conference reports may be accessed on the FMCSA website. These Conference Reports are guidelines for examiners.

Medical examiners who perform FMCSA medical examinations should understand: (1) the specific physical and mental demands associated with operating a CMV, (2) the physical qualifications standards specified by 49 CFR 391.41(b)(1-13), (3) the FMCSA advisory criteria and other criteria prepared by the FMCSA and (4) the FMCSA medical guidelines to assess a CMV driver's medical condition.

Medical examiners must understand the FMCSA medical standards, medical advisory criteria and the medical guidelines. A medical examiner must follow the standards found at 49 CFR § 391.41. In the case of vision, hearing, epilepsy and diabetes requiring any use of insulin, the FMCSA standards are absolute and allow no discretion by the medical examiner. The FMCSA also provides medical advisory criteria and medical guidelines to assist the medical examiner in determining if a person is physically qualified to operate a CMV. The guidelines are based upon expert review and are considered practice standards. A medical examiner may or may not choose to use these guidelines; however, the examiner must document the reasons for not following the guidelines.

While a medical certificate can be good for up to twenty-four months (49 CFR § 391.45(b)(1)), two years is the maximum validity period for a medical certificate. In several instances the regulations mandate that certificates be for a shorter period of time and require more frequent certification. By way of example, for a driver with hypertension (high blood pressure) if stable, the FMCSA Cardiovascular guidelines recommend annual re-certification. The FMCSA guidelines also recommend annual certification for drivers with heart disease. By regulation, annual certification is required for those with exemptions, such as driving in exempt intra-city zones, etc.

When an elevated blood pressure (BP) is found, certain BP elevations require re-certification at one year or as frequently as three months. Above a certain blood pressure elevation, the driver is disqualified and, once the blood pressure is reduced to a particular level, the driver can be re-certified at six month intervals. A medical examiner has the discretion to require more frequent monitoring for conditions of concern, such as diabetes mellitus or sleep disorders. Among drivers with conditions that can progress or fluctuate in severity and interfere with safe driving, the examiner may certify the driver for shorter periods. Significantly, in the present case, the original medical certificate given John Doe 1 was only a one year certificate.

The use of certain medications is regulated by the FMCSA, and the usage of other medications is within the discretion of the medical examiner. A driver cannot take a controlled substance or prescription medication without a prescription from a licensed practitioner. If a driver uses a drug identified in

21 CFR § 1308.1(49 CFR § 391.42(b)(12) or any other substance such as an amphetamine, narcotic, or any other habit forming drug, the driver is medically unqualified. There is an exemption: the prescribing doctor can write that the driver is safe to be a commercial driver while taking the medication; in this instance, the medical examiner may, but does not have to certify the driver. However, any anti-seizure medication used for the prevention of seizures is disqualifying. Methadone use is disqualifying.

Medical examiners have two ways to determine if any medication a driver uses will adversely effect safe operation of a CMV: (1) review each medication, whether prescription, non-prescription or a supplement or (2) request a letter from the prescribing doctor.

Even though a driver has a legal prescription, he or she may be disqualified if the medication could adversely affect the driver's ability to drive a CMV safely.

CMV drivers can be medically certified if they have a medical condition that is being treated by a physician; however, the decision is made by the medical examiner. A driver cannot receive certification if safe driving requires a restriction other than those on the DOT form. This again highlights the need to know of changes in the driver's health. Certification can be permitted if the driver does not have a condition, use medication or receive treatment that impairs safe driving. The medical examiner may request information about the driver's condition from the treating doctor, require additional testing or consultation.

Even though a CMV driver has a valid medical certificate, they can be prohibited from operating a CMV if they have a medical condition that develops after their last medical certificate was issued. FMCSA regulations prohibit a driver from beginning or continuing to drive if their ability and/or alertness is impaired by fatigue, illness or any cause that makes them safe to begin/ continue to drive a commercial motor vehicle. 49 CFR § 392.3. Even if a driver currently has a valid medical certificate, that driver is prohibited from driving a CMV with any medical condition that would be disqualifying or may interfere with the safe operation of a CMV. Once a disqualifying medical condition is resolved, and before resuming operation of a CMV, a driver is responsible for obtaining re-certification from a medical examiner. 49 CFR § 391.45.

In addition, any driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease must be re-certified. (391.45 c) The carrier determines if the driver's condition requires re-certification. (391.45 Interpretation, Question 3 Guidance).

Carriers have a duty to monitor driver status on an ongoing basis. For example, except for drivers with limited exemptions (subpart G) each motor carrier is required, at least once every 12 months, to review the motor vehicle record of each driver it employs to determine whether that driver meets minimum requirements for safe driving or is disqualified to drive a commercial motor vehicle. (49 CFR § 391.25).

A twenty-two person fatality bus accident near New Orleans in 1999 led to a significant change in the regulatory approach to the qualification of CMV

drivers. The National Transportation Safety Board (NTSB) made numerous recommendations; Congress thereafter adopted legislation to improve the certification and review process of the medical qualifications of the CMV drivers. The NTSB recommendations included establishing a comprehensive medical oversight program for commercial drivers and ensuring that medical examiners are qualified and know what to look for.

One of the NTSB's concerns was that medical examiners, though licensed medical practitioners, would not know how to apply the FMCSA physical qualification criteria in doing physical examination of CMV drivers nor did they appreciate the rigors of an interstate driver's job nor the magnitude of risk to which the general public was exposed. The NTSB also was concerned that the FMCSA regulatory scheme did not provide mechanisms for reporting and evaluating medical conditions that arise between required medical examiners. This led to federal legislation which, among other things, requires the US Dept. of Transportation, FMCSA, to create criteria for, and a national registry of, certified medical examiners (NRCME). 49 USC § 31149(Section 4116(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users of 2005, also known as "SAFETEA-LU).

The FMCSA has drafted a proposed Medical Examiner Handbook; it has not yet been finalized. It is subject to revision; however, it collects many of the current guiding principals for medical examiners. For example, in regard to the 49 CFR § 391.41(b)(12) regulation regarding medications, medical examiners are reminded that the effects and/or side effects of medications may

interfere with safe driving, in that drivers may experience an altered state of alertness, tension or even temporary confusion, while other medications may cause physical symptoms that can interfere with task performance or put the driver at risk for gradual or sudden incapacitation. Combinations of medications and/or supplements may have synergistic effects that accelerate side effects. Medical examiners are reminded that the demands of commercial driving can complicate adherence to prescribed dosage intervals and precautions. By way of example, irregular meal timing, periods of sleep deprivation and poor sleep quality and irregular and extended work hours can alter the effects of medicine and contribute to missing or irregular dosing.

The FMCSA reminds medical examiners that the general purpose of a health history and physical examination is to "detect the presence of physical, mental, or organic conditions of such character and extent as to affect the ability of the driver to operate a commercial motor vehicle (CMV) safely." A medical examiners' "fundamental obligation is to establish whether a driver uses one or more medications or supplements that have cognitive or physical effects or side effects that interfere with safe driving, thus endangering public safety." The FMCSA goes on to remind medical examiners that a "medical certification depends on a comprehensive medical assessment of overall health and informed medical judgment about the impact of single or multiple conditions on the whole person."

Medical examiners are instructed that review of medication use includes asking the driver to provide a complete history of medication use, including

OTC medications and food and herbal supplements. While the FMCSA medical examination report form includes health history questions and physical examination checklists, the FMCSA Examiner handbook recommends that the examiner ask additional questions to supplement information requested on the form. These can include questions to ascertain the driver's level of knowledge regarding appropriate use of medication while driving.

The FMCSA reminds medical examiners that important considerations regarding medication use while driving include ascertaining whether the medication

- Indicate(s) the presence of an underlying disqualifying disease or injury.
- Effectively treats the disease or medical condition
- Exhibits side effects that interfere with safe driving
- Has side effects that interfere with lifestyle function such as the driver may cease to comply with treatment (e.g., decreased libido)
- Has potential for gradual or sudden incapacitation or exacerbation of underlying medical condition due to a missed dose
- Requires monitoring to maintain a therapeutic dose or to prevent toxicity
- Interacts with other drugs, food and/or alcohol interfering with the ability to drive.

The medical examiner must also determine whether the driver

- Understands and complies with medication plans, including monitoring of same
- Knows the warning signs that might indicate medication toxicity, interaction, etc.
- Stores medications properly when driving long haul or cross country
- Reads and understands warning labels on medication and supplements
- Consults treating health care professional and/or a pharmacist before using new medication or combining medications while driving

The FMCSA also instructs medical examiners to document any discussions with drivers about

- Any affirmative history, including onset, date, diagnosis, the medications, doses of same and frequency, and any current limitation(s)
- Potential negative effects of medication use, including OTC medications while driving
- Any abnormal finding(s), noting the effect of driver's ability to operate a CMV safely and the necessary steps to correct the condition if appropriate, or reasons for disqualification
- Any additional tests or evaluations the medical examiner deems necessary

- Examiners are to record the name, address and phone number of the driver's treating physician(s). This helps facilitate contact between the examnaier and the treating physician.

The FMCSA medical certification process, which is designed to insure that drivers are physically qualified to operate CMVs safely, requires each driver to complete the health history section on the examination report and certify the responses are completely true. The driver also is required to certify that he or she understands that inaccurate, false or misleading information may invalidate the examination and the medical examiner's certificate. The FMCSA relies on the medical examiner's clinical judgment to decide whether additional information should be obtained from the driver's treating physician. Deliberate omission or falsification of information can invalidate an examination and any certificate based upon it. A civil penalty may also be levied against the driver under 49 USC § 521(b)(2)(b), either for making a false statement or for concealing a disqualifying condition.

In the FMCSA safety scheme, motor carriers are charged with enforcing the regulations, vis-à-vis drivers. It is the motor carriers who are legally responsible for the consequences of safety violations caused by drivers who they employ or with whom they contract or otherwise utilize.

The federal regulations set <u>minimum</u> guidelines for physical qualification and 49 CFR § 390.3(d) specifically allows a motor carrier to require and enforce more stringent requirements if they relate to safety operations and employee safety and health.

## THE INSTANT LITIGATION

PAM Transport, Inc. has created a comprehensive medical review clearance policy. Federal regulatory agencies, including the National Transportation Safety Board (NTSB) and FMCSA have recognized that driver physical qualifications must be monitored for changes between medical examinations, and with the utmost regard for the potential adverse and tragic consequences to the general public should a medically unqualified driver get behind the wheel of an 80,000 pound commercial motor vehicle (e.g., in the 1999 New Orleans bus crash), PAM Transportation has implemented a process that in my opinion properly exceeds the minimum criteria set by the FMCSA while taking into account the above stated concerns.

The FMCSRs only create minimum requirements for drivers, motor carriers and even medical examiners. The FMCSRs specifically allow motor carriers to exceed the minimum requirements and have more stringent requirements so as to foster safety, which is the FMCSA's "highest priority" (49 USC § 113(b). 49 CFR § 390.3(d) states:

> "*Additional Requirements.* Nothing in Subchapter B of this chapter shall be construed to prohibit an employer from requiring and enforcing more stringent requirements relating to safety of operation and employee safety and health."

The manner in which the FMCSA implements its regulations clearly encourages all parties to do more than the minimum. For example, the FMCSA's Medical Programs portion of its website tells drivers additional steps they should take regarding understanding how their prescription drugs, and even OTC

medications and herbal supplements, can effect their ability to safely operate their commercial vehicle. The current guidances and interpretations as well as the proposed NRCME handbook direct medical examiners to exercise their professional judgment and go beyond the minimum requirements when evaluating a driver's fitness to drive safely. In my opinion, PAM Transport's Medical Clearance policy is clearly designed to align it with the FMCSA's highest priority, safety.

The PAM policy properly recognizes that medical treatment or issuance of a prescription can signal the existence of a potentially disqualifying medical condition that should be investigated. PAM Transport, Inc.'s Medical Clearance Policy states:

> "Per company policy, illness or injury needs to be reported to the medical compliance department. If a driver seeks medical treatment through a licensed health care facility or medical provider, he or she will need to be cleared through the medical compliance department prior to getting back to work. This protocol has been established to ensure the safety of our drivers, the welfare of the public in general and compliance with DOT guidelines and internal criteria of the medical compliance department. Prescription drugs must be reported to the medical compliance before being allowed on the truck to ensure DOT compliance."

Medical treatment or issuance of a prescription are, in my opinion, a proper criteria for a motor carrier to initiate further inquiry into the current ability of a CMV driver to safely operate a CMV.

Nothing in the Federal Motor Carrier Safety Regulations (FMCSR) mandates that every inquiry into a driver's medical condition or prescription usage requires an actual hands on physical examination by a medical examiner. Indeed, given the hundreds of thousands of drivers subject to the FMCSR

physical qualification requirements, requiring actual physical examination by an examiner every time there is a question about treatment of a medical condition or issuance of a prescription would bring the regulated transportation industry to a grinding halt, as well as causing an inordinate expense to motor carriers which would have to pass the cost on to their customers, thus greatly impacting the cost of transportation, and thus, the economy.

The process used by PAM Transport is, in my opinion, well thought out to be initially as least intrusive as possible, with the level of inquiry increasing as appropriate for the particular circumstances.

The PAM Transport Medical Clearance Policy first step consists of an inquiry as to the nature of the medical treatment or prescription issuance. Many treatments or prescriptions can, upon this initial review, be determined to not have an impact on driver fitness and thus, inquiry ends there: e.g., whether dental treatment is a mere teeth cleaning or involved tooth extraction with prescription of painkillers which could impair safe driving and present a risk to the motoring public. In the latter instance, further inquiry is warranted.

During the Medical Clearance inquiry process, PAM Transport institutes a "medical hold" on drivers, i.e., they are not permitted to drive nor will they be dispatched until the inquiry process is completed. While many of the inquiries are very short lived, if the initial inquiry raises further questions, e.g., the prescription of painkillers, the medical hold reasonably continues until that further inquiry is resolved.

49 CFR § 392.3 prohibits motor carriers from allowing drivers whose ability or alertness is, or is likely to become, impaired from beginning or continuing to operate a commercial motor vehicle. In my opinion, it is quite appropriate for a regulated motor carrier to ask for medical records or more information from a treating or prescribing physician in order to meet the motor carrier's obligation to insure that only physically qualified drivers operate CMVs. In the instant case, where PAM Transport was advised that John Doe was treating with an infectious disease specialist and had a multiple medication regimen he was required to follow, it was perfectly reasonable, and indeed incumbent upon the motor carrier, to make further inquiry as to John Doe's condition and medications to determine whether they impaired his ability to safely operate a CMV.

While the treating doctor often has specific knowledge of the driver's illness or condition, Congress has recognized the need for, and the FMCSA is creating, the NRCME and standards for CMEs so examiners who can determine the effects of an illness or medication on commercial drivers and ensure driver and motor carrier compliance with the FMCSRs and the safety of the motoring public.

Review of the medical records and prescriptions, particularly in the case of John Doe, reasonably required a review by a medical examiner familiar with the FMCSA regulations, guidances and interpretations as well as the duties of a CMV driver in the employ of PAM Transport. Thus, the referral of John Doe's medical records, including his prescription regimen, for review by Dr. Craig Cooper, was an appropriate part of PAM's Medical Clearance review process.

In my opinion, Dr. Cooper did exactly what a medical examiner is supposed to do: he reviewed John Doe's condition, treatment and medication regimen with an eye toward whether or not they might impair his ability to safely drive a CMV. He was properly concerned with the extensive history of John Doe's non-compliance with his medication regimen. He was properly concerned with the potential physical effects or impairments his condition might pose, and properly concerned with potential impairment of ability to safely drive because of failure to follow medication regimens. He was also properly concerned with potential side effects of the medications even when taken properly, and/or when not properly taken or not taken at all.

In my opinion, Dr. Cooper was properly focused on the possible effect that symptoms of John Doe's condition (such as fatigue) might have on Doe's ability to safely operate a commercial vehicle, as well as the possible impairment of Doe's ability to safely drive that could result from [1] his documented history of failure to follow his medication regimen or [2] the potential side effects of Doe's medications even when properly taken as prescribed. In my opinion, the fact that Doe's particular condition is HIV was merely coincidental and essentially irrelevant to Dr. Cooper's concerns; Dr. Cooper's focus was properly on the effect of symptoms and medications on ability to safely drive, which concerns are the same whether the condition is HIV or any other chronic condition or disease.

Dr. Cooper's next step, in requesting clarification from Plaintiff's treating physicians, particularly as to the medications and medication regimens and the history of non-compliance was, in my opinion, precisely what a medical examiner

should do. Indeed, the FMCSA encourages medical examiners to contact treating physicians for further information.

Dr. Cooper's inquiries to the treating physicians were properly detailed, however, the responses from the treating physicians were lacking in detail and usable information. The mere statement that the numerous medications "should" not affect John Doe's ability to drive is insufficient when the federal regulations require that a more detailed response be given: se. e.g., 49 CFR § 391.41(a)(12)(ii). In my opinion, this is particularly true when you have multiple medications; each of them, and their possible interactions, should be separately addressed.

Once Dr. Cooper questioned John Doe's treatment and medication regimen, his then valid medical certification become invalid until the medical examiner's inquiries were satisfied. Because it appears that Dr. Cooper's inquiries were never properly responded to, John Doe remained physically disqualified under the FMCSR.

Nothing in the FMCSRs requires that a medical examiner, particularly in a medical compliance review process such as instituted by PAM Transport, conduct a physical examination of the CMV driver. In the instance of John Doe, a physical examination, in addition to being time consuming, expensive, and geographically untenable (Dr. Cooper was in Arkansas and John Doe was in Michigan), would not answer the questions properly raised by Dr. Cooper. Indeed, the FMCSA, in its guidances and interpretations, as well as its proposed NRCME handbook, clearly indicates that inquiries to treating physicians

regarding treatment or medications are precisely what a medical examiner is entitled to do.

When disputes arise regarding medical qualifications, the FMCSA has a regulatory process to resolve those disputes, found at 49 CFR § 391.47. In the present instance concerning John Doe, where Dr. Cooper's inquiries as to medical treatment and prescription regimen invalidated John Doe's medical certificate rendering him disqualified from driving a CMV, and when John Doe's treating physician proposed a clearance for return to CMV driving that Dr. Cooper and PAM Transport deemed inadequate, a dispute clearly existed. At that point, either party could seek review under 49 CFR § 391.47. However, nothing requires either party to do so. Further, as a matter of common sense, where John Doe's medical certificate had been invalidated and he was physically disqualified from driving, he would be the party who would initiate the appeal or review process. His failure to do so left him physically disqualified to drive a CMV in interstate commerce.

Ellison H. Wittels MD

Ellison H. Wittels, M.D., F.A.C.P.

July 13, 2011