# EXHIBIT I

A Yes.
Q And as the Director of Safety, since you've been the Director of Safety, has the Medical Compliance Department's medical clearance policy always been the same?
A I believe it has, yes.
Q You're not aware of any changes to the policy since you've become the Director or the VP of Safety?
A What do you mean by "changes"?
Q Has the language of the policy that we just read, has that changed at all since you've become the Director of -- VP of Safety?
A I don't know if there has been a language change or not, but the essence of what this says has remained the same.
Q I'm going to just quickly, since you brought that up. What does this policy mean to you? What do you understand this policy to mean?
A The top paragraph or the last one I read?
Q The last paragraph that you read.
A What that means to me is that if a driver is seeking medical treatment or is being prescribed medications, that they are to notify the Medical Department of that situation so that the Medical



Department can make sure that they are compliant to drive the vehicle.
Q So it's your understanding that drivers have to report every time they go to the doctor?
A Correct.
Q Under any circumstances?
A Yes.
Q So if the driver goes to the doctor for an annual physical, like, you know, to get his blood pressure checked, make sure everything is honky dory, he has to report that?
A Yes.
Q What if the driver goes in for a flu shot? Is it your understanding that he has to report that?
A I don't know that that's seeking medical treatment. I guess it is. It wouldn't -- I mean, they wouldn't be in trouble for reporting it.
Q If you look above -- we read two paragraphs when we looked at this medical clearance policy. The first paragraph is a quotation from the D.O.T. regulations; is that correct?
A Correct.
Q Now, when we look at the quotation appearing in the first paragraph, could you read that first? I'm sorry. That quotation for me,



again?
A "A person shall not drive a commercial motor vehicle unless he or she is physically qualified to do so and has on his or her person the original or a photographic copy of a medical examiner's certificate that he or she is physically qualified to drive a commercial motor vehicle -- commercial vehicle."
Q Is it your understanding that the paragraph you just read from the D.O.T. regulations requires that a driver notify his or her employer every time they go to the doctor?
A That specific part of that regulation does not, no.
Q Do you know of any parts of the regulation that requires a doctor -- I'm sorry -- a driver to inform his or her employer about going to the doctor?
A No.
Q Earlier we talked about different programs and whatnot that P.A.M. has in order to implement the regulations, and we talked about the fact that there's a program you guys utilize to ensure that everything is there for driver -- the driver qualification folder. We talked about the drug



testing program that you guys have.
Is it your understanding that the second paragraph that we -- appearing in Exhibit 1, the paragraph that begins, "Per company policy..." is that sort of program that we discussed earlier?
A Yes. A program to ensure that we meet the -- our regulatory requirements.
Q So, again, when we talked about programs, we said that was something that P.A.M. came up with itself to make sure that -- or to implement in order to make sure that they are following the D.O.T. regulations; correct?
A Yes.
Q It's not something verbatim stated and required by the D.O.T. regulation?
A It is not verbatim required, and It's not -- again, I want to make sure we understand. That's not my department, but it appears to me that that's what that is, yes.
Q Okay. I'm sorry.
When you say "that's what that is," I want to make sure it's clear for the record.
A A program designed to ensure that we meet the requirements of the Federal Motor Carrier Safety regulations.

and regulations state that a driver's medical card may be revoked, suspended, or re-evaluated for medical reasons. Even though a driver may have a valid medical card, if the driver's ability to perform his or her normal duties have been impaired by a physical or mental injury or disease, the driver is required to get a new medical examination in accordance with Part 391.45, FMCSR, and approval from -- and approval from the by the Safety Compliance Department."
Q Okay. I'm going to stop you right there.
You just read that it's -- Swift's policy is referring to Part 391.45 of the FMCSR; is that correct?
A Yes.
Q And is that the same section that the P.A.M. policy at Exhibit 1 is referring to?
A No. No. P.A.M. policy is referring to 391.41.
Q Okay. Now, can you continue to go on?
A "This will ensure that every driver meets all D.O.T. health requirements even after that driver has a medical card. The driver is responsible for contacting the Safety Department and Human Resources whenever the driver cannot perform



his or her normal duties."
Q Will you agree that nothing in the Swift policy as it reads requires a driver to go to the Safety or Human Resources Department each time they go to the doctor?
A No.
Q Let's flip to the first page of Exhibit 2.
At the very bottom, there's the Medical Examination Policy. Do you see that?
A Yes.
Q Can you read that and let me know when you're finished reading it?
MR. DAMM: Read it out loud?
MS. MACK-BROWN: He doesn't need to read it out loud.
BY MS. MACK-BROWN:
Q Have you already read it?
A Yes.
MR. DAMM: The court reporter wants him to read it out loud.
MS. MACK-BROWN: When I said read it, review it.
BY MS. MACK-BROWN:
Q But you can read it out aloud. Let's read it into the record.



A "Medical Examination: All applicants, rehires, and current drivers must meet D.O.T. rules and regulations pertaining to health requirements to drive or continue to drive a commercial motor vehicle. A D.O.T. physical and drug screen will be administered to each applicant who has received a conditional offer of employment rehire and current driver. All Swift drivers must meet D.O.T. rules and regulations. See Section 391..."
Q I'm going to stop you right there. I'll let you continue in a second.
Is Section 391 the same section that's referred to in the P.A.M. policy at Exhibit 1?
A 391 is the same section, yes.
Q Okay. Go ahead.
A "...to be hired and continue driving for the company. All Swift drivers are required to have valid medical certificates not over two years old since it was issued with them at all times while operating company equipment. All Swift drivers are required to be recertified every two years. The purpose of this policy is to meet all D.O.T. rules and regulations pertaining to health requirements so that a driver is D.O.T. certified. Drivers are responsible for recertification of their medical



card every two years. Compliance will send the driver's driver manager a reminder requiring renewal of the medical card prior to expiration."
Q We just read the last section on the first page of Exhibit 2.
Is there anything in that last section on the first page of Exhibit 2 that requires a driver at Swift to see the Medical Department or consult the Medical Department or the Safety Department or any department within Swift each and every time they go to a doctor or a medical professional?
A No.
Q Earlier, remember we were talking about different programs that each motor carrier can implement in order to come up to satisfy as they believe their requirements to be under the D.O.T. regulations?
Is this an example of a different -- a program that Swift has that's different from a program that P.A.M. has?
A It appears to be. Just with what I have in front of me, yes.
Q Now, you earlier mentioned that you talked to your new hires or new recruits, your new processors about their ADA regulations. Have you

spoken with any other individuals in P.A.M. about their obligations under the ADA?
A Primarily my people.
Q Primarily your people? So as a part of your job, it's not your responsibility to speak with anybody else about the ADA?
A It's not my responsibility, no.
Q Do you understand that the ADA prohibits employers from asking medical questions, inquiries of their employees in general and -- strike that.
Do you agree that the ADA prohibits medical inquiries in certain circumstances?
A No.
Q Okay. Do you know anything about what the ADA says about an employer making a medical inquiry to one of its current employees?
A No. I know what it says about making medical inquiries to applicants.
Q Yeah. So it's not -- you don't have anything to do with P.A.M. making medical inquiries to current employees, you just focus on the applicant portion of it?
A That's correct.
Q And that's -- because that falls under your department?



A Yes.
Q Okay. Does the Swift policy that we read, Exhibit 2, comply with the D.O.T. regulations?
MR. DAMM: Excuse me. I'm going to object. It calls for a legal conclusion on a document that he has no basis for understanding whatsoever, how it's implemented.
BY MS. MACK-BROWN:
Q You can answer the question.
A It appears that it could -- yeah. It appears that it would -- it could meet the most minimum qualifications, and that's kind where it gets -- that's kind of where it gets different. The Federal Motor Carrier Safety Regulations are the bare minimum, and they authorize motor carriers to have stricter policies or procedures other than what is in there, and they also place the responsibility for having medically-qualified drivers on the motor carrier. It's the motor carrier's responsibility to do that, not just the medical examiner, so this meets --
Q When you say "this," I'm sorry, just for the record, can you be specific about what you're referring to?
A Well, Exhibit 2. It's just basically



saying, "We follow the D.O.T. rules and regulations. We're going to have you medically qualified every two years, and should you become in a way where your health has changed and you can't perform your duties, you've got to let us know."
Q So is the answer to my question "Yes"?
A It could be. It would almost -- it would almost require -- I'm sure somebody from the Department of Transportation would say there's a lot more to it than that.
Q Well, the question that I ask --
A Yes.
Q -- and that you've just answered "Yes" to was: Does the Swift policy that we just covered in Exhibit 2 comply with the D.O.T. regulations?
I know you said that the D.O.T. regulations allow motor carrier to be more strict, but does the policy we just read in Exhibit 2 comply with the D.O.T. regulations?
A That's a very broad statement because --
Q It's not a statement. It's a question.
A Well, it's a very broad question, then, because if you look at Part 391, it's about 12 pages long --
Q Right. But it's really a --



A This is a snippet.
MR. DAMM: Excuse me. Don't interpret the witness. Let him answer your question.
BY MS. MACK-BROWN:
Q I can -- the question I asked is: Does the policy comply with D.O.T. regulations?
You've answered "Yes," so I'm just going to go on and I'm going to ask you another question.
A Okay. Okay.
Q Because, remember, we talked about Hire Right, right, a little while ago?
A Right. Yes.
Q And Hire Right is some place that collects information on drivers; is that right?
A Yes.
Q You said that one company -- you couldn't remember the company -- accepted Hire Right's documents as satisfaction of their duty to get background information on their driver applicants; is that correct?
A Yes.
Q And you said that that met the qualification -- I'm sorry -- that met the requirements of the D.O.T.; correct?
A Yes.

Q Now, P.A.M. decided to do something more than what the other company that you couldn't remember decided to do and actually go -- they use the Hire Right but they actually go and call the employers? Is that what you were saying?
A Yes. Make a written record.
Q So that's going above and beyond what the -- one company you were discussing who only used Hire Right did?
A Yes.
Q But it's correct in saying that the company who used Hire Right was meeting the D.O.T. regulations?
A Yes. They were meeting the minimum.
Q Let's refer back to Exhibit 1, if we can.
A Okay.
Q And that's Exhibit 1. Just so we can be clear, it's the P.A.M. policy?
A Yes.
Q Do you think changes could be made to this policy and it would still comply with D.O.T. regulations?
A Yes. I think changes could -- it could be altered and it would still meet the minimum requirements.



Q Okay. How could it be altered, do you think, and still meet the requirements?
A By just saying you've got to have a physical every two years. In essence, that's -- that you've got to have a medical examiner's certificate that is current and is renewed every two years would meet the bare minimum.
Q So if they have the exact verbatim policy that Swift has, if P.A.M. had the exact verbatim policy that Swift has, it would still meet the D.O.T. regulations?
MR. DAMM: Same objection, for the record.
THE WITNESS: Yes. It's -- yes.
BY MS. MACK-BROWN:
Q I just have a couple more follow-up questions.
MR. DAMM: The check's in the mail.
BY MS. MACK-BROWN:
Q Do you have any relatives that work for P.A.M.?
A Yes. A brother-in-law.
Q Okay. What does he do?
A He's a Vice President of Pricing, I believe.
Q He's not a driver?



A No.
Q Do you know anyone else that works for a trucking company as a driver? And I'm not talking about people that you aren't in contact with. Anybody that you talk to on a regular basis and is a trucker for another trucking company?
A No.
Q Does the Medical Review Department ever come to you with questions? Anyone in the Medical Review Department ever come to you with questions?
A Not unless it involves somebody that's in the process -- not unless it's from the recruiting side. Might perhaps needing our assistance saying, "Hey, I'm having a hard time reaching so and so. Do you have a good contact number on him where I can talk to him?" that sort of thing, but not -- not professional questions.
Q You know Janice Brown?
A Yes.
Q Do you ever advise Janice Brown on whether or not to clear drivers and clear them for dispatch?
A No. That is Janice's decision.
Q You know we deposed Janice Brown earlier today and yesterday?
A Yes.



Q She referred to you as a mentor. I'm not saying that you know that, but she thinks of you as a mentor.
How have you mentored Janice Brown?
A I've mentored Janice more than anything on, really, just the -- the inner workings of a trucking organization, how -- how one job can impact something else in the organization. Basically, educating her about the trucking business.
Q Has Janice Brown ever come to you with questions about specific drivers?
A Not that I recall. Now, Janice -- Janice will come to me if she is going to disqualify somebody sometimes to let me know that, but, no, not to come say, "What should I -- what so I do here?" nothing like that.
Q When she -- you said she comes to you to let you know that she's going to disqualify you, can you explain to me what you mean by that?
A When we -- in the hiring process, my people take the applicant to the conditional offer of employment stage. From there, we turn them over to the Medical Compliance Department where then we are -- we're in neutral or idling until the Medical Compliance Department comes back with a pass or